## THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| DEANNA RANDALL, individually and on behalf of the ESTATE OF KEVIN RANDALL,<br><br>Plaintiffs,<br><br>v.<br><br>SMITH & EDWARDS COMPANY, a Utah corporation; JASON PEEK, an individual, and EMMALEE WOODLAND, an individual,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART [79] DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING [81] PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:20-cv-00183-DBB<br><br>District Judge David Barlow<br>Magistrate Judge Jared C. Bennett |

Before the court are Plaintiffs Deanna Randall and the Estate of Kevin Randall's and Defendants Smith and Edwards Company, Jason Peek, and Emmalee Woodland's cross-motions for summary judgment.[1] Both parties seek summary judgment on Plaintiffs' five remaining causes of action for violations of the Family and Medical Leave Act, violations of the Americans with Disabilities Act, and intentional infliction of emotional distress. The claims arise out of Kevin Randall's employment with and termination from Smith and Edwards Company while he was suffering from End Stage Liver Disease. For the reasons that follow, the court grants in part and denies in part Defendants' Motion for Summary Judgment[2] and denies Plaintiffs' Motion for Summary Judgment.[3]

---

[1] ECF Nos. 79, 81, filed Dec. 15, 2022.
[2] Defs.'s Mot. Summ. J., ECF No. 79.
[3] Pls.'s Mot. Summ. J., ECF No. 81.

# BACKGROUND

Smith and Edwards Company ("Smith & Edwards") is a Utah corporation. It has two retail stores located in Utah.[4] In addition, it markets products online and ships them throughout the United States.[5] It employs approximately 200 employees.[6]

Between 2017 and 2020, EmmaLee Woodland was Smith & Edwards' Web Store Manager.[7] As Web Store Manager, Ms. Woodland directed the growth of Smith & Edwards' online catalog by updating the company website, maintaining the Amazon Seller Account, and overseeing customer service for online customers.[8] She supervised the Web Store Associate position.[9]

Smith & Edwards hired Kevin Randall as a Web Store Associate at Smith & Edwards in September 2017.[10] He was classified as a full-time employee[11] and received health insurance through the company.[12] The Web Store Associate position "is part of the team adding products to [Smith & Edwards'] website as well as providing customer support, building Smith & Edwards' online presence, and creating online content for the store's customers."[13] The most important duty is "putting products on the website."[14] That entails referencing a spreadsheet created by Ms. Woodland, gathering the dimensions for the products on the spreadsheet, collecting and resizing images of those products, writing descriptions for those products, and then uploading that

---

[4] Pls.'s Mot. Summ. J., Pls.'s Statement of Undisputed Facts ¶ 1; *admitted at* Defs.'s Opp'n, ECF No. 91.
[5] Peek Dep. 15:22–16:1, Woodland Dep. 30:12–30:14.
[6] Peek Dep. 31:7–31:12.
[7] *Id.* at 29:7–29:10.
[8] Defs.'s Resp. to Pls.'s First Set of Disc. Reqs. 9, ECF No. 79-2 at 10.
[9] *Id.* at 9–10.
[10] Woodland Dep. 49:5–49:7.
[11] Peek Dep. 94:1–94:2.
[12] *Id.* at 43:16–43:25. Smith & Edwards covered between 60 and 80 percent of the premiums for an employee's health insurance. *Id.* at 44:1–44:19.
[13] Web Store Associate Job Description 1, ECF No. 81-1 at 270.
[14] *Id.* at 30:2–30:4.

information into the inventory database and the Smith & Edwards website.[15] It is the best practice for a Web Store Associate to gather product dimensions by physically retrieving the product, carrying the product up and down the long, steep staircase to their office, and taking its measurements for shipping purposes.[16] However, an associate could also retrieve the product's measurements from online sources.[17] This process of adding products into the online inventory is typically described as "product imports," "product uploads," or "SKUs" by Smith & Edwards and its employees.[18] The ratio of product imports to written descriptions (or "product descriptions") is not equal; an employee may complete many more product imports than written descriptions in a month.[19] This is because some products share written descriptions (e.g., one clothing description can be used for all colors and sizes of that piece of clothing, but each size and color item is a unique product).[20] Mr. Randall had a product import benchmark of "200 to 250, depending on how many weeks were in the month."[21]

---

[15] Woodland Dep. 31:14–31:23.

[16] Parker Dep. 11:7–11:17.

[17] Woodland Dep. 35:21–35:25.

[18] *See* Smith and Edwards Performance Evaluation Apr. 2018 at 1, ECF No. 79-8 at 2. The record reflects some degree of confusion among lawyers and witnesses about the difference between product uploads/imports, SKUs, and product/written descriptions. *See* Woodland Dep. 98:19–98:25 (attorney using "SKU goal" and "product descriptions" interchangeably); *id.* at 42:2–42:4 ("Q. And you had given Kevin a requirement that he meet 200 descriptions per month, correct? A. No. That was SKUs."); *id.* at 33:12–33:25 ("Q. So let's start with Kevin Randall. How many product descriptions was he required to do minimum from 2017 to, let's say, 2019? A. We based our progress not specifically on the descriptions that we wrote, to start with. So the total number of products that needed to be uploaded to the website for Kevin was 200 to 250, depending on how many weeks were in the month. And that, again, wasn't descriptions that he had to have written. It was the products that needed to be uploaded to the website."); Hedin Dep. 19:8–19:11 ("Q. And I want to make sure I understand. Is there a difference between written descriptions and products for purchase? A. I don't know."). *See also* Defs.'s Resp. to Pls.'s First Set of Disc. Reqs. 12, ECF No. 79-2 at 13 ("His monthly goal at this time was to prepare 50 products per week for iNet. This included individual items (1 SKU per description) and style/color/size items (2-40 SKUs per description). His monthly average was 115.43 SKUs."); *id.* ("Since work from home began in March 2020, product descriptions written were far below minimum expected. Required amount per week is 50 products. Kevin has completed approximately 85 product descriptions from March 17, 2020 to June 9, 2020. His duties and responsibilities were removed except for writing product descriptions and collecting product images. A new goal was set to write 10 product descriptions per day and collect their images."); *id.* at 11 (In January 2019, "Kevin's goal was to add 10 SKUs per day, resulting in 200-250 SKUs per month being added to the website. (Including all SKUs tied to a style/color/size listing).").

[19] *See* Woodland Dep. 34:1–34:3 (stating a certain associate's product upload requirement is 600); *id.* at 38:24–39:1 (stating that same associate's average written descriptions is 223 per month).

[20] *See id.* at 37:1–37:6.

[21] *Id.* at 33:16–33:20, 91:24–92:3; Defs.'s Resp. to Pls.'s First Set of Disc. Reqs. 11.

3

*Smith & Edwards Employee Policy Manual*

At Smith & Edwards, all employment relationships are at will.[22] The manual provides that all employees are subject to a three-month evaluation period after they are hired.[23] After 90 days, their manager will evaluate whether the employee meets the requirements of their position.[24] For employees with "performance issues" post-dating the evaluation period, a manager may give them additional training, downgrade their position, or re-assign them if possible.[25] At that point, an employee may be placed on a 90-day probationary period.[26] If after two warnings an employee's performance has not improved, the manual provides for the employee's termination.[27]

The Employee Policy Manual also describes Smith & Edwards' "Progressive Discipline Policy and Procedure."[28] It identifies certain offenses and then provides that those offenses will result in immediate dismissal, termination after review, termination after a written warning, or termination after two or more warnings.[29] As is relevant here, under the "Termination after Two or More Warnings" heading, the following offenses are included: "Violations of the policies outlined in this employee policy manual" and "[f]ailure to perform duties in a consistently acceptable manner."[30] It provides that,

> If you engage in behavior in this category, you will first be given a verbal warning by your manager and reminded of the Company policy regarding the behavior. If your behavior continues to include these actions, your manager will issue a written warning detailing the problem behavior, the corrective steps required, and a time limit for improvement. You will be placed on a 90-day probationary

---

[22] Smith & Edwards Employee Policy Manual 3, ECF No. 81-1 at 105.
[23] *Id.* at 13.
[24] *Id.*
[25] *Id.* at 19.
[26] *Id.* at 20.
[27] *Id.*
[28] *Id.* at 17–20.
[29] *Id.* at 18–19.
[30] *Id.* at 19.

period. When a written warning is issued, your manager may
suspend you for 3 days without pay. If your problem behavior
continues, your employment will be terminated.[31]

Regarding expected conduct, the manual informs employees that "[c]ell phones are

prohibited when [an] employee is clocked in," that it is "unacceptable to visit other departments

and converse with co-workers about non-work related matters," and that "[u]sing social media

while at work, except while on breaks or lunches, is strictly prohibited."[32] It also describes Smith

& Edwards' policy on family and medical leave and disability accommodation.[33]

*Mr. Randall's Initial Employment Performance at Smith & Edwards*

Mr. Randall began working as a Web Store Associate in September 2017. Four months

later, Ms. Woodland gave Mr. Randall a raise because "he was meeting the necessities of his

job."[34] Then, around seven months in, Ms. Woodland completed a performance evaluation with

Mr. Randall.[35] On an April 2018 Performance Evaluation form, Ms. Woodland marked that Mr.

Randall "Fully Meets Job Requirements" in seven of the form's ten categories: "Job

Knowledge," "Work Safety," "Adaptability," "Attitude," "Initiative," "Judgment," and "Overall

Effectiveness."[36] He "Exceed[ed] Job Requirements" in the "Dependability" category.[37] In the

"Volume of Work" and "Quality of Work" categories, Ms. Woodland marked that Mr. Randall

"Meets Minimum Requirements."[38] She recorded that his "Strengths" were "Punctuality,

Dependability, Adaptability, [and] Willingness to learn/be taught."[39] His "Weaknesses" were his

---

[31] *Id.*
[32] *Id.* at 7, 15, 22.
[33] *Id.* at 9, 13–14.
[34] Woodland Dep. 52:2–52:17.
[35] Smith and Edwards Performance Evaluation Apr. 2018 at 1, ECF No. 79-8 at 2.
[36] *Id.* at 1–2.
[37] *Id.* at 2.
[38] *Id.* at 1.
[39] *Id.* at 3.

"Process Retention" and easy distractibility.[40] She wrote down that his "Accomplishments" included importing around 200 products in 2018.[41] Under his "Responsibilities," she wrote, "[i]mport at least 280 products to the website monthly."[42] She noted that Mr. Randall "was warned about Social Media use @ work on 4/13/18" and that he "agreed to stop that practice."[43] However, Ms. Woodland recalls that Mr. Randall did not stop using his cell phone at work—he "improved for a short period of time, probably a week to two weeks, and then he fell right back into the same behavior."[44]

On July 17, 2018, Ms. Woodland held a second evaluation of Mr. Randall,[45] prompted by Mr. Randall's failure to notify Ms. Woodland that he was about six hours behind on a project before its deadline.[46] While Ms. Woodland recorded that she had "usually been satisfied w/ work completed" and that "people enjoy [Mr. Randall's] presence in the office," she noted that Mr. Randall showed "continued disregard toward the feedback [and] instruction [that Ms. Woodland was] providing."[47] She issued a verbal warning and informed Mr. Randall he would receive a written warning the next time he did not complete a project on time without communicating that he was behind or if he continued to use cell phones and personal email improperly at work.[48]

Two months later, in September 2018, Mr. Randall received a second raise "[a]s incentive to stay at the store and try to perform well."[49] The next month, Ms. Woodland and Mr.

---

[40] *Id.*
[41] *Id.* at 1.
[42] *Id.* Ms. Woodland stated in her deposition that she had miscalculated the 280 figure; the actual benchmark was 200–250. Woodland Dep. 91:20–92:3.
[43] *Id.*
[44] Woodland Dep. 56:5–56:12.
[45] July 17, 2018 Evaluation, ECF No. 79-3.
[46] Woodland Dep. 54:6–55:3.
[47] July 17, 2018 Evaluation 1.
[48] *Id.*
[49] Woodland Dep. 53:6–53:11.

Randall completed a performance evaluation of Mr. Randall.[50] Ms. Woodland marked that Mr. Randall "Fully Me[t] Job Requirements" in the "Job Knowledge," "Quality of Work," "Work Safety," "Adaptability," "Attitude," "Initiative," and "Overall Effectiveness categories."[51] Ms. Woodland marked that he "Exceed[ed] Job Requirements" in the "Dependability" category and "Me[t] Minimum Requirements" in the "Volume of Work" and "Judgment" categories.[52] They set a "[g]oal" for Mr. Randall to "[s]tay more focused" and "[e]nd conversations quickly."[53] During 2018, Ms. Woodland found issues with Mr. Randall's work four times and talked to him about those issues each time.[54]

In January and then again in June 2019, Ms. Woodland recalls having a conversation with Mr. Randall about his slow "pace of work."[55] In September 2019, Ms. Woodland initiated another performance evaluation of Mr. Randall.[56] This time, Mr. Randall "Exceed[ed] Job Requirements" in the "Job Knowledge," "Work Safety," "Attitude," and "Dependability" categories.[57] He "Fully Me[t] Job Requirements" in the "Quality of Work," "Adaptability," "Initiative," "Judgment,"  and "Overall Effectiveness" categories.[58] His "Volume of Work" fell somewhere between "Meets Minimum Requirements" and "Fully Meets Job Requirements."[59] She noted that Mr. Randall "[h]elped contribute to achieving the 2019 yearly SKU goal in 9 months," "[s]uccessfully helped many customers find a resolution to their concern after contacting us," and "[a]chieved his monthly SKU goal in the month of August."[60] Under

---

[50] Smith and Edwards Performance Evaluation Sept. 2018, ECF No. 79-7 at 2.
[51] *Id.* at 1–2.
[52] *Id.* at 1–2.
[53] *Id.* at 3.
[54] Woodland Dep. 89:19–89:24.
[55] Defs.'s Resp. to Pls.'s First Set of Disc. Reqs. 10–12, ECF No. 79-2 at 11–13.
[56] Smith and Edwards Performance Evaluation Sept. 2019, ECF No. 79-9 at 2.
[57] *Id.* at 1–2.
[58] *Id.* at 1–2.
[59] *Id.* at 1.
[60] *Id.*

"[W]eaknesses," Ms. Woodland noted "[v]olume of work": "[n]eed to work on the volume of products prepared for the website."[61] She added that "[t]alking too long with other employees," "[r]etaining information/processes," and "[s]taying on task @ your desk" were other weaknesses.[62] Attached to the Performance Evaluation form was an Action Plan that included items for "[m]ore practice with SCS," "[w]riting descriptions vs. [c]opy + [p]asting," "decrease 'chatty' time at the desk (Both of Us)," "[t]ell myself to focus," and for Ms. Woodland to "ask 'What are you working on' more."[63]

*Mr. Randall's End Stage Liver Disease Diagnosis and Subsequent Employment Performance*

Until fall 2019, Mr. Randall had been the only Web Store Associate.[64] That September, another Web Store Associate was hired part-time.[65] In October 2019, Mr. Randall was diagnosed with End Stage Liver Disease ("ESLD").[66] He met with Jason Peek, Human Resource Manager for Smith & Edwards, and Ms. Woodland that month and told them he had liver disease and would need a transplant.[67] Mr. Peek and Ms. Woodland told him, "if you need time off, please take it."[68] Mr. Randall told them "he would if he needed to."[69]

The next month, Mr. Randall received a written Final Warning on a Smith and Edwards Employee Warning Notice form.[70] The offense types were "Substandard Work" and "Failure to follow written/verbal instructions."[71] The "Description of the Infraction" provided that "[p]roducts were placed in the wrong category" and "[r]estricted shipping products weren't

---

[61] *Id.* at 3.
[62] *Id.* at 4.
[63] *Id.*
[64] Defs.'s Resp. to Pls.'s First Set of Disc. Reqs. 13–14, ECF No. 79-2 at 14–15.
[65] *Id.* at 14.
[66] Medical Progress Notes Oct. 9, 2019, ECF No. 81-1 at 453.
[67] Peek Dep. 49:6–49:11; Defs.'s Resp. to Pls.'s First Set of Disc. Reqs. 8, ECF No. 79-2 at 9.
[68] Peek Dep. 48:5–48:10.
[69] *Id.* 48:13–48:15.
[70] Employee Warning Notice Nov. 7, 2019, ECF No. 79-5.
[71] *Id.* at 1.

marked accordingly."[72] Additionally, "[d]escriptions were exactly the same for all 26 products imported."[73] This evinced a "[f]ailure to follow directions given verbally [and] listed in the Notes google doc" and "[f]ailure to adhere to outlined guidelines."[74] The warning added that "[i]f major infractions occur on a future import (multiple mistakes on 1 import), [Mr. Randall's] employment w[ould] be terminated."[75] Mr. Randall was not placed on a probationary period.[76] On the back of the warning, Ms. Woodland added that,

> Multiple verbal warnings have been received prior to the receipt of this final warning. The employee's projects have often needed additional work from his manager to correct mistakes that occurred when the imports were completed. The employee has had multiple conversations and requests to comply with the provided guidelines from his manager prior to this final warning being issued.[77]

Ms. Woodland had not documented the prior verbal warnings in Mr. Randall's personnel file.[78] After this litigation was commenced, Ms. Woodland went back over project spreadsheets in Mr. Randall's project folder "to document issues with [Mr.] Randall's work."[79] In total, she documented six instances that preceded the Final Warning in which his spreadsheets had issues.[80]

In February 2020, Mr. Randall was approved to be listed for a liver transplant.[81] He received Family and Medical Leave Act ("FMLA") paperwork from Smith & Edwards on March 2, 2020.[82] On March 11, 2020, Mr. Randall's health care provider, Dr. Richard Gilroy, and his

---

[72] *Id.*
[73] *Id.*
[74] *Id.*
[75] *Id.*
[76] Peek Dep. 97:4–97:11,
[77] Employee Warning Notice Nov. 7, 2019 at 2.
[78] Woodland Dep. 62:19–62:23.
[79] Woodland Decl. ¶ 4, ECF No. 91-1 at 2.
[80] Defs.'s Resp. to Pls.'s First Set of Disc. Reqs. 10–12, ECF No. 79-2 at 11–13.
[81] Gilroy Dep. 36:20–36:23.
[82] Defs.'s Resp. to Pls.'s First Set of Disc. Reqs. 8, ECF No. 79-2 at 9; Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act), ECF No. 79-10 [hereinafter Certification].

transplant coordinator, Craig Myrick, completed the FMLA Certification of Health Care Provider for Employee's Serious Health Condition form ("Certification").[83] Dr. Gilroy recorded that Mr. Randall's condition had commenced in October 2019 and the "[p]robable duration of [the] condition" was "until liver transplant."[84] He marked that Mr. Randall would "need to have treatment visits at least twice per year due to the condition," and that Mr. Randall was not "unable to perform any of [his] job functions due to the condition."[85] Dr. Gilroy wrote that "End Stage Liver Disease (ESLD) requires compliance with multi-disciplinary team care plan including routine lab testing and other diagnostic testing."[86] He marked that Mr. Randall would be incapacitated for a single continuous period of time due to his medical condition, estimating that the period of incapacity would be "12 weeks."[87] He marked that Mr. Randall would need to attend follow-up treatment appointments or work part-time or on a reduced scheduled because of his medical condition, and that these treatments or the reduced number of hours of work were medically necessary.[88] In the section of the form designated for Dr. Gilroy to "[e]stimate treatment schedule," he wrote, "Post transplant care plan requires variable appts from weekly to monthly schedule."[89] He also marked that the condition would cause "episodic flare-ups periodically preventing [Mr. Randall] from performing [his] job functions," and that it was "medically necessary for the employee to be absent from work during the flare-ups" because "ESLD is progressive. Possibility of further decline is always possible."[90] He estimated the frequency of flare-ups would be once per month for two to three days.[91]

---

[83] *Id.* at 7–10; Myrick Dep. 43:1–43:19.
[84] Certification 2.
[85] *Id.*
[86] *Id.*
[87] *Id.* at 3.
[88] *Id.*
[89] *Id.*
[90] *Id.*
[91] *Id.*

10

Mr. Randall returned this Certification to Mr. Peek sometime in March 2020.[92] Mr. Peek

issued a "Designation Notice" on March 13, 2020.[93] It stated that "Your FMLA leave request is

approved. All leave taken for this reason will be designated as FMLA leave."[94] In his deposition,

Mr. Peek stated that the leave was conditionally approved, pending the date Mr. Randall went in

for his transplant surgery.[95]

Once the COVID-19 pandemic hit, Craig Smith, an owner of Smith & Edwards, and Ms.

Woodland made the decision to have Mr. Randall work from home due to his medical

condition.[96] On March 17, 2020, Ms. Woodland sent Mr. Randall an email with the subject line,

"Work from Home."[97] She wrote, "I want you to make sure and take care of yourself during this

time. As you mentioned on the phone, your [sic] a bit more susceptible because of your liver

stuff, so please take as much time away from the store as you need and feel necessary."[98] She

also listed "expected responsibilities." These consisted of checking emails and forwarding them,

writing product descriptions for the projects placed in Mr. Randall's folder, and approving

Amazon return requests.[99] Ms. Woodland also mentioned one nonessential duty: printing

Amazon orders.[100]

Between March and June 2020, the Smith & Edwards web store experienced a 65 to 75

percent increase in online orders.[101] Web Store Associates had more work due to the increase,

especially with customer service calls and refunds.[102] The workload became "much more

---

[92] Peek Dep. 61:19–61:21.
[93] Designation Notice (Family and Medical Leave Act), ECF No. 81-1 at 457.
[94] *Id.*
[95] Peek Dep. 55:3–55:16.
[96] *Id.* at 51:24–52:9.
[97] Work from Home Email, ECF No 79-12.
[98] *Id.*
[99] *Id.*
[100] *Id.*
[101] Woodland Dep. 45:9–45:24.
[102] *Id.* at 46:4–46:15.

difficult to manage" if one of the two Web Store Associates (Mr. Randall and the part-time employee who was hired in September 2019) was out.[103] Ms. Woodland felt as though she did not have enough employees to handle the increased workload, but she understood that "there was not room in [the] budget for an additional employee" so she did not "pursue the topic."[104]

On April 1, 2020, Mr. Randall messaged Ms. Woodland and told her he was third on the transplant list.[105] Ms. Woodland responded, "This is fantastic news. Let us know when you get the call so I can get that ten days counting down for your recovery."[106] On April 3, 2020, Ms. Woodland messaged Mr. Randall saying, "They all miss you, too. They've been asking me how you are doing. It felt great to give [Mr. Peek] that update on your liver status. He's very excited."[107]

On April 29, 2020, Ms. Woodland wrote to Mr. Randall and said, "You've been doing a great job and taking care of e-mails and it looks as though you've been pretty good at writing descriptions and all that jazz. Keep up the great work and keep me in the loop with what is going on medically so we can work with you the best way possible."[108] Later in that conversation, Mr. Randall responded, "I appreciate everything you are doing for me. I haven't been sleeping well yet. I am tired all the time. I try to get up and walk around and that wears me out."[109] Ms. Woodland asked him for any updates on his transplant timeline.[110] Mr. Randall informed her that he was still third on the list.[111]

---

[103] *Id.* at 47:22–47:24.
[104] *Id.* at 47:25–48:13.
[105] *Id.* at 127:10–127:19.
[106] *Id.* at 127:20–127:24.
[107] *Id.* at 131:19–132:11.
[108] *Id.* at 132:23–133:9.
[109] *Id.* at 134:16–135:3. Mr. Randall "express[ed] being tired" more than once to Ms. Woodland. *Id.* at 145:6–145:10, 146:1–146:25.
[110] *Id.* at 135:12–135:14.
[111] *Id.* at 135:20–135:22.

On June 3, 2020, after Mr. Randall made a comment about getting a liver, Ms. Woodland asked if Mr. Randall had "[a]ny additional news on how that's coming along."[112] He told her he was still at third on the transplant list.[113] Mr. Randall told Ms. Woodland he wanted to visit, but he was not "sure if [he] c[ould] make it up the stairs."[114] Ms. Woodland told him, "[i]f that's safe for you to do so and you want to schedule a day you [sic] visit, I'll arrange to have the upstairs come to you."[115] At the time, Ms. Woodland understood that Mr. Randall could not walk up the stairs because of his medical condition.[116]

Mr. Randall took time off to attend doctors' appointments between October 2019 and June 2020.[117] Mr. Randall notified Ms. Woodland about his doctors' appointments,[118] and Ms. Woodland would schedule him to leave early on those days.[119] Mr. Randall was required to clock out when he went to an appointment.[120]

Mr. Randall's wife, Deanna Randall, worked from home during the beginning of the pandemic as well.[121] She worked in their kitchen, and Mr. Randall worked in their living room.[122] She reports that she heard Mr. Randall request accommodations for his diminished ability to work.[123] He requested "[h]is hours to be lowered and his workload to be lowered."[124] Mrs. Randall further states that she heard Mr. Randall ask for a decrease in his product upload goal twice in May 2020.[125] She states that she later heard him ask if he could have more

---

[112] *Id.* at 138:21–139:5.
[113] *Id.* at 139:9–139:18.
[114] *Id.* at 139:21–139:24.
[115] *Id.* at 139:25–140:3.
[116] *Id.* at 140:4–140:12.
[117] *Id.* at 108:7–108:14.
[118] *Id.* at 108:7–108:11, 129:1–129:13, 133:21–134:9, 145:3–145:5.
[119] Peek Dep. 50:6–50:13; Woodland Dep. 108:7–108:14.
[120] Peek Dep. 53:13–53:22.
[121] Randall Dep. 112:24–113:4.
[122] *Id.* at 113:11–113:12.
[123] *Id.* at 113:15–113:17.
[124] *Id.* at 113:18–113:20.
[125] Randall Aff. ¶ 4, ECF No. 81-1 at 463.

flexibility with the number of product uploads he was required to do on a daily basis.[126] In

contrast, Ms. Woodland states that Mr. Randall never asked if he could do less product

descriptions.[127] Mr. Peek, who handles requests for accommodations,[128] states that Mr. Randall

never requested a decrease in workload or work hours, only the ability to go to doctors'

appointments.[129]

On June 9, 2020, Ms. Woodland gave Mr. Randall a second Final Warning for

"Substandard Work."[130] She described that, "[w]hile working from home . . . the number of

descriptions written were far below the minimum expected. The required monthly minimum is ~

250 products, or 50 per week. The number of descriptions written between March 17 and June 9

was approx. 85."[131] The "Plan for Improvement" consisted of "writ[ing] a minimum of 10

descriptions per day, while also checking emails + approving Amazon Return Requests . . . ."[132]

"Inability to meet the work requirements specified regarding descriptions + other requirements

after 2 weeks will result in termination."[133] Mr. Peek participated in the phone call during which

Ms. Woodland gave Mr. Randall the Final Warning.[134] Mr. Randall told Mr. Peek and Ms.

Woodland that this plan for improvement was doable.[135]

On June 20, 2020, Mr. Randall messaged Ms. Woodland to tell her "I don't feel well. I'm

going to go lay down for a bit."[136] On June 27, 2020, nearing the end of the two-week period,

Mr. Randall messaged Ms. Woodland and told her, "Hey, I may have to go in to the InstaCare

---

[126] *Id.* at ¶ 5.
[127] Woodland Dep. 142:12–142:14.
[128] Peek Dep. 20:22–20:24, 31:13–32:23, 37:24–38:6.
[129] *Id.* at 50:22–51:8.
[130] Employee Warning Notice June 9, 2020, ECF No. 79-6 at 2.
[131] *Id.*
[132] *Id.*
[133] *Id.*
[134] Peek Dep. 80:4–80:5.
[135] *Id.* at 80:17–81:1.
[136] Woodland Dep. 146:2–146:5.

today because I'm leaking."[137] Later that day, he messaged her again, saying, "I can't take this anymore. I'm going to the clinic."[138]

*Termination*

At 12:15 a.m. on June 29, 2020, Mr. Randall received his first call notifying him that a liver transplant was available.[139] As he and Mrs. Randall were preparing to leave for the hospital, they received a follow-up call, informing them that the transplant team was rejecting the offer because the liver was bad.[140] Later that day, Mr. Peek called Mr. Randall.[141] Mr. Randall told Mr. Peek about his early morning transplant alert.[142] Mr. Peek then informed Mr. Randall that Smith & Edwards had to terminate his employment because Mr. Randall was not completing the target number of descriptions per day.[143] When asked if he had any questions, Mr. Randall responded, "No. I just don't know what I'm going to do about insurance."[144]

At some point, Mr. Randall called Mr. Peek back.[145] Mr. Randall "stated he turned in FMLA paperwork," and "this is a reason he should . . . not have been terminated."[146] Mr. Peek told Mr. Randall that Mr. Randall "had never taken any leave, which FMLA is used for."[147] Mr. Peek reminded Mr. Randall that he "was always allowed time off for doctors' appointments or if he was sick."[148] Mr. Peek told Mr. Randall that Mr. Randall "had been working every day and he was planning on using his FMLA leave after he had had his surgery."[149]

---

[137] Woodland Dep. 150:15–150:24.
[138] *Id.* at 151:2–151:8.
[139] Randall Dep. 69:3–69:8.
[140] *Id.* at 69:9–69:16.
[141] Randall Dep. 97:8–98:21.
[142] *Id.* at 97:14–97:25.
[143] *Id.* at 98:8–98:16.
[144] *Id.* at 98:18–98:21.
[145] Peek Dep. 84:13–84:16.
[146] *Id.* at 83:24–84:2.
[147] *Id.* at 84:2–84:4.
[148] *Id.* at 84:4–5.
[149] *Id.* at 84:5–84:7.

While having received a notice about their eligibility for COBRA coverage, the Randalls did not initially pay for the coverage.[150] That meant that on July 1, 2020—two days after his termination—Mr. Randall was no longer insured.[151] This resulted in his status becoming "inactive" on the transplant list, making him ineligible to receive a liver.[152]

Mrs. Randall reports that Mr. Randall stopped eating, stopped exercising, and began sleeping all day.[153] Concurrently, Mrs. Randall "began experiencing intense and severe panic."[154] She "worr[ied] about how [she] could support [her] family with one income, [and] how this would affect [Mr. Randall] mentally and physically."[155] She "worried intensely that [Mr. Randall] would die" and "felt powerless and desperate."[156] Mrs. Randall had difficulty sleeping at night. [She] could not eat, . . . [she] lost 60 pounds during this time, and [she] began losing [her] hair."[157]

At some point in July, Mrs. Randall's employer began to pay the Randalls' COBRA insurance costs.[158] Consequently, on July 29, 2020, Mr. Randall regained "active" status on the transplant list.[159] Mr. Randall was admitted to the hospital on August 2, 2020 for a possible organ offer, but the transplant did not occur.[160] He received another offer on August 10, 2020.[161] Again, the transplant did not occur.[162] Then, on September 13, 2020, Mr. Randall was taken into surgery to receive a transplant, but the transplant was canceled due to his "clear non-

---

[150] Randall Dep. 75:10–75:19.
[151] Myrick Dep. 32:11–32:16, 72:22–73:11.
[152] Id. at 34:20–34:23, 49:10–49:11; Gilroy Dep. 38:1–38:10.
[153] Randall Aff. ¶ 8.
[154] Id. at ¶ 16.
[155] Id.
[156] Id. at ¶ 17.
[157] Id. at ¶ 19.
[158] Randall Dep. 82:1–82:3, 92:6–92:8; Randall Aff. ¶ 21.
[159] Gilroy Dep. 51:22–51:23.
[160] Progress Notes August 12, 2020, ECF No. 81-1 at 512.
[161] Id. at 514.
[162] Randall Dep. 72:13–72:15.

tolerability."[163] Mr. Randall was taken back to the ICU.[164] The doctors informed Mrs. Randall

that Mr. Randall was "no longer eligible to be on the transplant list and that they were just going

to make him comfortable until he passed on his own."[165] On September 16, 2020, Mr. Randall

died as a result of End Stage Liver Disease.[166] He was 58 years old.[167] After his death, Mrs.

Randall "continued to experience hair loss, difficulty sleeping, weight loss, increased depression,

anxiety, nightmares, and panic attacks, among other things."[168]

On December 2, 2020, Plaintiffs filed this action in state court.[169] The complaint included

causes of actions for wrongful death, discrimination due to disability status under the Americans

with Disabilities Act ("ADA"), failure to provide reasonable accommodation under the ADA,

retaliation under the Family and Medical Leave Act, interference with FMLA leave, negligence,

intentional infliction of emotional distress, negligent infliction of emotional distress, and

negligent employment.[170] On December 22, 2020, Defendants removed the case to this court.[171]

On June 9, 2022, the parties filed a notice with the court, stating that they had stipulated

to voluntary dismissal of Plaintiffs' wrongful death, negligence, and negligent infliction of

emotional distress claims.[172] In their opposition, Plaintiffs also stipulated to the dismissal of their

negligent employment claim.[173] On December 15, 2022, the parties filed cross-motions for

---

[163] Surgical Documentation, ECF No. 81-1 at 468; Randall Dep. at 70:1–70:18.
[164] Randall Dep. 70:16–70:18.
[165] *Id.* at 70:19–70:22.
[166] Randall Aff. ¶ 24.
[167] *Id.* at ¶ 24.
[168] *Id.* at ¶ 26.
[169] Complaint, ECF No. 2-1.
[170] *Id.*
[171] ECF No. 1.
[172] ECF No. 62.
[173] Pls.'s Opp'n 17, ECF No. 94.

summary judgment on all the remaining claims.[174] The cross-motions were fully briefed in February 2023.

## STANDARD

"Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"[175] "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[176] "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[177] "[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[178] "[T]he trial judge shall then grant summary judgment if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law."[179]

"The filing of cross-motions for summary judgment does not necessarily concede the absence of a material issue of fact."[180] "This must be so because by the filing of a motion a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted."[181] "Accordingly,

---

[174] ECF Nos. 79, 81.
[175] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[176] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[177] *Id.*
[178] *Id.* at 249.
[179] *Id.* at 250.
[180] *Brown v. Perez*, 835 F.3d 1223, 1230 n.3 (10th Cir. 2016), *as amended on reh'g* (Nov. 8, 2016) (quoting *Nafco Oil & Gas, Inc. v. Appleman*, 380 F.2d 323, 324–25 (10th Cir. 1967)).
[181] *Id.*

'[c]ross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.'"[182]

## EVIDENTIARY OBJECTIONS

"'To determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury' in some form."[183] "The requirement is that the party submitting the evidence show that it will be possible to put the information, the substance or content of the evidence, into an admissible form."[184] "Hearsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment because 'a third party's description of a witness' supposed testimony is 'not suitable grist for the summary judgment mill.'"[185]

Here, Defendants make numerous evidentiary objections to Plaintiffs' statement of undisputed facts. The court addresses those necessary to deciding the motions.

### I.       Mrs. Randall's Testimony about Ms. Woodland's Exchanges with Mr. Randall Is Inadmissible Hearsay.

First, Defendants object to Plaintiffs' use of a statement from Mrs. Randall's deposition in which Mrs. Randall asserts that Ms. Woodland would speak to Mr. Randall in a belittling manner.[186] Defendants argue that it is hearsay and not based on personal knowledge.[187] Plaintiffs

---

[182] *Id.* (quoting *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007)
[183] *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006) (quoting *Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006)).
[184] *Brown*, 835 F.3d at 1232 (quoting 11 James Wm. Moore et al., *Moore's Federal Practice–Civil* § 56.91 (3d ed. 2015)).
[185] *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (quoting *Wright–Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1268 (10th Cir. 1998)).
[186] Defs.'s Opp'n 7, ECF No. 91.
[187] *Id.*

19

claim that "[o]ne or more exceptions to hearsay apply pursuant to Rule 803 including 803(1), 803(2), 803(3)."[188]

The basis for the factual assertion is a number of statements by Mrs. Randall describing what Mr. Randall told her Ms. Woodland said. Hearsay "means a statement that the declarant does not make while testifying at the current trial or hearing and a party offers in evidence to prove the truth of the matter asserted in the statement."[189] Here, none of the statements are being offered to prove the truth of the matter asserted—Plaintiffs are not attempting to prove that Mr. Randall was any of the terms Ms. Woodland purportedly used to describe him. Moreover, Ms. Woodland is an opposing party, and therefore her statements are not hearsay when offered by Plaintiffs.[190]

However, Mrs. Randall is not testifying just to Ms. Woodland's statements; she is testifying that Mr. Randall related those statements to her. She is offering her husband's statements for the truth of the matter asserted—that "Ms. Woodland *said* . . . ." They are offered to prove the fact of Ms. Woodland making those statements about him, to him.

Because the statements from Mr. Randall to Mrs. Randall are hearsay, an exemption or exception must apply for them to be admissible. Plaintiffs argue that Mr. Randall's statements fall into the exceptions for present sense impressions, excited utterances, or then-existing mental, emotional, or physical conditions.[191] But because all three of those exceptions require that the declarant make the statement in close temporal proximity to the event, condition, state of mind, or feeling, and because no facts have been identified that suggest Mr. Randall's statements to Mrs. Randall were close in time to Ms. Woodland's statements to Mr. Randall, there is no basis

---

[188] Pls.'s Reply 10, ECF No. 95.
[189] Fed. R. Evid. 801(c).
[190] *See* Fed. R. Evid. 801(d)(2).
[191] Fed. R. Evid. 803(1)–(3).

for finding that those exceptions apply. Therefore, the court will not consider those statements for purposes of summary judgment.

## II.     The FMLA Certification Is Admissible as a Record of a Regularly Conducted Activity.

Defendants next argue that the Certification of Health Care Provider for Employee's Serious Health Condition is inadmissible hearsay.[192] Plaintiffs argue that "[o]ne or more exceptions to hearsay apply pursuant to Rule 803 including 803(4), 803(6), 803(8). Moreover, Craig Myrick and Dr. Gilroy can testify as to their own statements in the Certification."[193] And, Defendants rely on the same Certification in their undisputed fact section.[194]

The Certification is a form from the Wage and Hour Division of the Department of Labor.[195] There appear to be three different contributors to the form: a person who filled in the "For Completion by the EMPLOYER" section, a person who wrote responses in the "For Completion by the EMPLOYEE" section, and a person who wrote responses in the "For Completion by the HEALTH CARE PROVIDER" section.[196] According to the form, the "Provider's name" is "Richard Gilroy, MD."[197] Dr. Gilroy and Mr. Myrick recall assisting Mr. Randall with his FMLA paperwork.[198]

The Certification is hearsay if offered to prove the truth of any of the statements in the form. Federal Rule of Evidence 803(6) provides a hearsay exception for "records of a regularly conducted activity," commonly referred to as the business records exception.[199] Under this exception, a "record of an act, event, condition, opinion, or diagnosis" is admissible if "the

---

[192] Defs.'s Opp'n 9, ECF No. 91.
[193] Pls.'s Reply 11, ECF No. 95.
[194] Defs.'s Mot. Summ. J. 7, ECF No. 79.
[195] Certification 1–3.
[196] *Id.* at 1.
[197] *Id.*
[198] Gilroy Dep. 24:8–24:13; Myrick Dep. 43:8–44:7.
[199] Fed. R. Evid. 803(6).

record was made at or near the time by--or from information transmitted by--someone with knowledge; the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; making the record was a regular practice of that activity; all these conditions are shown by the testimony of the custodian . . . ; and the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."[200]

The Certification fits squarely into Rule 803(6)'s exception for records of a regularly conducted activity. It was made in March 2020 by Mr. Peek, Dr. Gilroy, Mr. Myrick, and presumably Mr. Randall (although the only information he directly contributed was his name). It was kept in the course of a regularly conducted activity of the transplant team—Dr. Gilroy stated that he often assists transplant patients with such FMLA paperwork because "[t]hat's part of [his] job."[201] The Certification is a form provided by the Wage and Labor Division of the Department of Labor, meaning that making it is a regular practice of assisting transplant patients seeking FMLA leave, and Dr. Gilroy can testify to these facts. Defendants have not shown that the evidence is untrustworthy; to the contrary, Defendants rely on it as the basis for undisputed facts in their Motion for Summary Judgment. Finally, the Certification does not contain any of Mr. Randall's statements, so there is no additional hearsay contained within the document to consider. Therefore, the court will consider the Certification.

### III. Mrs. Randall's Testimony about Mr. Randall's Requests for Accommodations Is Admissible; Her Testimony about Ms. Woodland's Responses Is Inadmissible Hearsay.

Next, Defendants argue that Mrs. Randall's statements about Mr. Randall's requests for accommodations and whether Smith & Edwards granted such requests are inadmissible hearsay

---

[200] Id.
[201] Gilroy Dep. 24:11–24:13.

and are not based on personal knowledge.[202] Plaintiffs respond that "[o]ne or more exceptions to hearsay apply pursuant to Rule 803 including 803(1), 803(2), 803(3)."[203]

In her deposition, Mrs. Randall stated that while Mr. Randall was working for Smith & Edwards, she heard him request accommodations such as decreasing his hours and his workload.[204] When Mr. Randall was working from home, beginning in March 2020, Mr. Randall worked in the living room and Mrs. Randall worked in the kitchen.[205] She reports that she heard Mr. Randall request, more than once, accommodations for his diminished ability to work.[206] He also requested accommodations to attend his medical appointments.[207] Mrs. Randall stated that, "[e]arly on," Ms. Woodland reduced Mr. Randall's requirement for product descriptions from twelve-and-a-half per day to ten per day.[208] But "[a]s his health began to get worse and his mental capacity began to decline, [Mr. Randall] asked a couple of more times if they could reduce it even more."[209]

This evidence does not appear to be hearsay because Mr. Randall's alleged utterances are not statements offered for the truth of the matter asserted. A "statement" is "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion."[210] And, while questions may "in some way convey an implicit message," "the important question is whether an assertion was intended."[211] Mr. Randall's requests were not intended assertions; he

---

[202] Defs.'s Opp'n 11, ECF No. 91.
[203] Pls.'s Reply 14, ECF No. 95.
[204] Randall Dep. 113:18–113:20; *see* Pls.'s Mot. Summ. J. 22, ECF No. 81.
[205] *Id.* at 113:3–113:12.
[206] *Id.* at 113:15–113:17, 115:1–115:11.
[207] Randall Dep. 115:15–115:18.
[208] *Id.* at 114:21–114:24, 116:14–116:21.
[209] *Id.* at 116:19–116:21.
[210] Fed. R. Evid. 801(a).
[211] *United States v. Jackson*, 88 F.3d 845, 848 (10th Cir. 1996) (quoting *United States v. Long*, 905 F.2d 1572, 1580 (D.C.Cir. 1990)).

was asking his supervisor a question. There is no "truth of the matter asserted" to Mr. Randall's requests.

However, Ms. Woodland's responses to Mr. Randall's requests require a different analysis. Ms. Woodland's responses are out of court statements offered for the truth of the matter asserted: that Smith & Edwards denied some of Mr. Randall's requests for accommodations. An exemption or exception must apply for them to be admissible, and an exemption applies: statements by an opposing party.[212]

The admissibility issue is that Mrs. Randall does not provide a basis for the court to find she has personal knowledge of these statements. Federal Rule of Evidence 602 provides that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."[213] While Mrs. Randall testifies that she heard Mr. Randall request accommodations, there is no record evidence that she heard Ms. Woodland's responses as well. Because there is no record evidence indicating that Mrs. Randall has personal knowledge of Ms. Woodland's responses, this becomes a hearsay within hearsay issue: Ms. Woodland told Mr. Randall, who apparently then told Mrs. Randall. For the statements to be admissible, there must be a hearsay exemption or exception for the layer of hearsay in which Mr. Randall conveyed Ms. Woodland's denials to Mrs. Randall. However, there is no record evidence providing the necessary facts for the court to find that Mr. Randall relayed Ms. Woodland's statements while or immediately after she said them—as required by Rule 803(1)— or while he was still excited by the event of her making those statements—as required by Rule 803(2). Further, repeating Ms. Woodland's statements are not statements of Mr. Randall's then-

---

[212] Fed. R. Evid. 801(d)(2).
[213] *Id.* 602.

existing state of mind or emotional, sensory, or physical condition. Accordingly, the court will not consider this evidence.

### IV.   Mr. Randall's Communications to Ms. Woodland about His Symptoms Are Admissible.

Next, Defendants object to the evidence of Mr. Randall's communications to Ms. Woodland about his symptoms.[214] Plaintiffs respond that "[o]ne or more exceptions to hearsay apply pursuant to Rule 803 including 803(1), 803(2), (803)(3) [sic], 803(6).[215]

In her deposition, Ms. Woodland stated that Mr. Randall told her in April 2020 that he was tired all the time and that he got worn out by walking around the house.[216] Mr. Randall's statements to Ms. Woodland are hearsay if offered for the truth of the matter asserted (but if offered for effect on the listener, they are not hearsay). However, the exception provided by Federal Rule of Evidence 803(3) applies to these statements: they are statements of the declarant's then-existing physical condition such as bodily health or mental feeling. The "all the time" part of the statement does not qualify for this exception, because it describes more than Mr. Randall's then-existing condition. Therefore, this part of Mr. Randall's statement to Ms. Woodland will not be considered by the court.

### V.   Mr. Randall's Messages to Ms. Woodland Are Admissible, Both for Non-Hearsay and Hearsay Purposes.

Defendants also object to Mr. Randall's statements to Ms. Woodland notifying her about his need to go to an urgent care clinic due to him "leaking" on June 27, 2020.[217] Plaintiffs argue

---

[214] Defs.'s Opp'n 11.
[215] Pls.'s Reply 14.
[216] Woodland Dep. 134:20–134:25.
[217] Defs.'s Opp'n 12.

that "[o]ne or more exceptions to hearsay apply pursuant to Rule 803 including 803(1), 803(2), (803)(3) [sic], 803(6)."[218]

As with Mr. Randall's other messages to Ms. Woodland, these messages are not hearsay if offered to prove the effect on Ms. Woodland (she understood Mr. Randall had to go to the Instacare[219]) or notice to Ms. Woodland. If offered for the truth of the matter asserted—that Mr. Randall was "leaking" and believed that he might need to seek medical care, the hearsay exception in Rule 803(3) applies. These are statements made by Mr. Randall about his then-existing physical condition ("I'm leaking") and his state of mind (intent to go to Instacare). Therefore, this evidence will be considered.

## VI.   Mr. Myrick's Testimony about Whether Mr. Randall Was Using Intermittent FMLA Leave Is Inadmissible Because He Lacks Personal Knowledge.

Defendants object to Mr. Myrick's testimony that Mr. Myrick understood that Mr. Randall was actively taking intermittent FMLA beginning in March 2020.[220] They believe such evidence is hearsay and not based on personal knowledge.[221] Plaintiffs respond that "[o]ne or more exceptions to hearsay apply pursuant to Rule 803 including 803(1), 803(2), 803(3), 803(4), [and] 803(6)."[222]

Mr. Myrick's understanding of whether Mr. Randall was using FMLA leave prior to his termination is speculation and is not based on personal knowledge. Mr. Myrick testified that it was "more of an assumption on [his] part."[223] This testimony is barred by Rule 602, and the court will not consider it.

---

[218] Pls.'s Reply 14–15.
[219] Woodland Dep. 150:22–150:24.
[220] Defs.'s Opp'n 14.
[221] Id.
[222] Pls.'s Reply 17.
[223] Myrick Dep. 44:19–44:24.

**VII.   Mr. Parker's Statements about Smith & Edwards' Termination of Mr. Randall Are Inadmissible Because He Lacks Personal Knowledge.**

Defendants next object to Randy Parker's statements characterizing Smith & Edwards' termination of Mr. Randall and his statements about what Smith & Edwards knew.[224] Defendants argue that this is inadmissible character evidence, not based on personal knowledge, and an unsupported opinion.[225] Plaintiffs respond that Mr. Parker has personal knowledge of Mr. Randall's treatment and statements made by Smith & Edwards.[226]

Mr. Parker was a manager of a department at Smith & Edwards while Mr. Randall worked there.[227] He was not Mr. Randall's supervisor, and he did not work directly with Mr. Randall, except for when Mr. Randall had questions on products.[228] In his deposition, he repeatedly acknowledged that he did not have first-hand knowledge of Mr. Randall's employment.[229] Mr. Parker described that Mr. Randall "was in another office" so Mr. Parker would not have been able to "observe [his treatment] personally."[230] Instead, he heard certain things from Mr. or Mrs. Randall.[231] Considering the record evidence, Mr. Parker does not appear to have personal knowledge of the purportedly undisputed facts for which Plaintiffs rely on his testimony. Therefore, the court will not consider it.

---

[224] Defs.'s Opp'n 18–19.
[225] *Id.*
[226] Pls.'s Reply 21.
[227] Parker Dep. 12:4–12:6, 29:15–29:16.
[228] *Id.* at 33:11–33:20.
[229] *Id.* at 17:4–17:8, 19:21–19:24, 22:8–22:10, 32:17–33:10, 33:21–33:25.
[230] *Id.* at 39:18–39:21.
[231] *Id.* at 32:24–33:2, 34:4–34:9, 42:1–42:3 ("Q. How did you come to know that or how did you come to that belief? A. Well, in talking with Kevin and Deanna."); *id.* at 42:7–42:12, 45:17–45:24.

## DISCUSSION

### I.   Plaintiffs' ADA and FMLA Claims Are Not Preempted by ERISA.

The Employee Retirement Income Security Act's ("ERISA") preemption clause provides that it "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."[232] "Before preemption will be found, three requirements must be met[:] [t]here must be a state law, an employee benefit plan, and the state law must 'relate to' the employee benefit plan."[233]

Plaintiffs' federal claims—under the Family and Medical Leave Act and the Americans with Disabilities Act—are not preempted by ERISA as they are not state law.[234] That leaves Plaintiffs' remaining state law claims for intentional infliction of emotional distress ("IIED"). The court need not resolve whether the IIED claims are preempted because, as discussed in Section III below, the IIED claims are not cognizable.

### II.   Plaintiffs' ADA and FMLA Claims Survive Mr. Randall's Death.

"The question of the survival of an action grounded in federal law is governed by federal common law when, as here, there is no expression of contrary intent."[235] "The general rule under the federal common law is that an action for a penalty does not survive the death of the plaintiff."[236] "Typically, a court is required to infer from a reading of the relevant statute and its history whether a cause of action is penal or remedial in nature."[237] For this, there is a "three-factor analysis requiring an assessment of '1) whether the purpose of the statute was to redress

---

[232] 29 U.S.C. § 1144(a). The section defines "state laws" as "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." *Id.* at §1144(c)(1).

[233] *Airparts Co. v. Custom Ben. Servs. of Austin, Inc.*, 28 F.3d 1062, 1064 (10th Cir. 1994) (quoting *Nat'l Elevator Indus., Inc. v. Calhoon*, 957 F.2d 1555, 1557 (10th Cir. 1992)).

[234] 29 U.S.C. §1144(c)(1).

[235] *Slade for Est. of Slade v. U.S. Postal Serv.*, 952 F.2d 357, 360 (10th Cir. 1991) (quoting *Smith v. Department of Human Servs.*, 876 F.2d 832, 834 (10th Cir. 1989)).

[236] *Smith*, 876 F.2d 832, 834–35 (10th Cir. 1989) (quoting *Schreiber v. Sharpless*, 110 U.S. 76, 80 (1884)).

[237] *Id.* at 835.

individual wrongs or more general wrongs to the public; 2) whether recovery under the statute runs to the harmed individual or to the public; and 3) whether the recovery authorized by the statute is wholly disproportionate to the harm suffered.'"[238]

In other contexts, the Tenth Circuit has described the ADA as having "broad remedial purposes,"[239] and the Supreme Court has described the FMLA as a "comprehensive remedial mechanism."[240] The parties have not cited and the court is not aware of any binding authority expressly holding that the ADA or the FMLA are remedial or penal in nature for purposes of claim survival. Accordingly, the court applies the three-factor analysis for each statute.

"The ADA's purposes include 'assuring . . . 'full participation'' in society for individuals with disabilities, as well as 'equality of opportunity,' so that disabled individuals may 'compete on an equal basis and . . . pursue those opportunities for which our free society is justifiably famous.'"[241] This purpose is to address individual wrongs against persons with disabilities. Recovery under the ADA runs to the harmed individual: "the complaining party may recover compensatory and punitive damages . . . from the respondent."[242] Recovery is proportionate to the harm suffered because a plaintiff may only recover punitive damages if the defendant acted with malice or reckless indifference, and there are limitations on the sum of damages awarded.[243] Therefore, the ADA is remedial in nature.[244]

---

[238] *Id.* at (quoting *Murphy v. Household Finance Corp.*, 560 F.2d 206, 209 (6th Cir. 1977)).

[239] *Butler v. City of Prairie Vill., Kan.*, 172 F.3d 736, 744 (10th Cir. 1999) (quoting *Haynes v. Williams*, 88 F.3d 898, 899 (10th Cir. 1996)); *see Exby-Stolley v. Bd. of Cnty. Commissioners*, 979 F.3d 784, 798 (10th Cir. 2020) ("Moreover, introducing an adverse-employment-action requirement into an ADA failure-to-accommodate claim would significantly frustrate the ADA's remedial purposes.").

[240] *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002); *see also Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 734 (2003).

[241] *Exby-Stolley*, 979 F.3d at 798 (quoting *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1037 (10th Cir. 2011); 42 U.S.C. § 12101(a)(8)); *see id.* § 12101(b)(2), (4).

[242] 42 U.S.C. § 1981a(2).

[243] *Id.* § 1981a(2)–(3); *id.* § 2000e-5(g)(1).

[244] Other courts have made similar determinations. *See Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1057 (9th Cir. 2018); *Guenther v. Griffin Constr. Co., Inc.*, 846 F.3d 979, 986 (8th Cir. 2017); *Haberle v. Troxell*, 885 F.3d

In enacting the FMLA, "Congress was attempting to alleviate the economic burdens to both the employee and to his or her family of illness-related job-loss" [and] "attempting to prevent those with serious health problems from being discriminated against by their employers."[245] This purpose is clearly to address individual wrongs to individuals rather than more general wrongs to the public. Additionally, recovery under the FMLA runs to the individual: "Any employer who violates . . . this title shall be liable to any eligible employee affected."[246] Finally, damages are proportionate. The FMLA provides for compensatory damages—"any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation" *or* "any actual monetary losses sustained by the employee as a direct result of the violation"—and for liquidated damages equal to that sum unless the employer acted in good faith.[247] The Tenth Circuit has held that the "relief provided in FMLA . . . parallels the provisions of the FLSA,"[248] and the Supreme Court has found that the FLSA's "liquidated damage provision is not penal in its nature."[249] Accordingly, the FMLA, including its liquidated damages provision, is remedial in nature.[250]

This means that unless a statute applies, the ADA and FMLA claims survived Mr. Randall's death. In their reply, Defendants argue that federal common law does not apply

---

170, 175 (3d Cir. 2018); *Kettner v. Compass Grp. USA, Inc.*, 570 F. Supp. 2d 1121, 1134 (D. Minn. 2008); *Estwick v. U.S.Air Shuttle*, 950 F. Supp. 493, 498 (E.D.N.Y. 1996); *Nall v. BNSF Ry. Co.*, 2019 WL 2716756, at *4 (S.D. Tex. June 28, 2019).

[245] *Brockman v. Wyoming Dep't of Fam. Servs.*, 342 F.3d 1159, 1164 (10th Cir. 2003) (citations omitted).

[246] 29 U.S.C. § 2617(a)(1).

[247] 29 U.S.C. § 2617(a)(1); *see Smith.*, 876 F.2d at 837 ("[C]laims for reinstatement, backpay, and other benefits under the ADEA are clearly remedial in nature."). While the Tenth Circuit has noted that a claim for solely liquidated damages changes the essence of an action under a generally remedial statute to penal, that is not the situation at hand. *Id.*

[248] *Jordan v. U.S. Postal Serv.*, 379 F.3d 1196, 1201 (10th Cir. 2004) (quoting S.Rep. No. 103–3, at 35 (1993), *reprinted in* 1993 U.S.C.C.A.N. 3, 37).

[249] Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 707 (1945).

[250] Several other district courts have come to the same conclusion. *See Turner v. Sullivan Univ. Sys., Inc.*, 420 F. Supp. 2d 773, 780 (W.D. Ky. 2006); *Cardella v. CVS Caremark Corp.*, 2010 WL 1141393, at *2 (N.D. Tex. 2010); *Schonewolf v. Waste Mgmt., Inc.*, 2018 WL 1381133, at *5 (E.D. Pa. 2018).

because "the Tenth Circuit already determined long ago that 42 U.S.C. § 1988 applies to the ADA and other employment-related claims, and therefore state statutes determine survival of personal injury actions involving employment and discrimination claims."[251] Defendants point to case law concerning Title VII and ADA claims, and then argue that "[t]here is no reason to apply a different standard to FMLA" because the facts behind the ADA and FMLA claims are "virtually undistinguishable."[252] Plaintiffs' position is that by the "express language" of § 1988(a), it does not apply to claims under the ADA or FMLA.[253] They also argue that "[d]ismissing Plaintiffs' claims under Utah's survival statute would be 'inconsistent' with federal law," but that "[e]ven if the court looks to Utah's survival statute pursuant to § 1988(a), Plaintiffs' ADA and FMLA claims survive."[254]

In *Robertson v. Wegmann*, the Supreme Court held that the decision as to the applicable survivorship rule in § 1983 actions is governed by 42 U.S.C. § 1988(a).[255] Section 1988(a) provides that:

> The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of titles 13, 24, and 70 of the Revised Statutes for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial

---

[251] Defs.'s Reply 4–5.
[252] *Id.* at 5. Defendants do not cite to any case as support for this proposition.
[253] Pls.'s Opp'n 23.
[254] *Id.* at 29.
[255] *Robertson v. Wegmann*, 436 U.S. 584, 588 (1978).

> and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty.[256]

As the Court noted, "one specific area not covered by federal law is that relating to 'the survival of civil rights actions under § 1983 upon the death of either the plaintiff or defendant.'"[257] "Under § 1988, this state statutory law, modifying the common law, provides the principal reference point in determining survival of civil rights actions, subject to the important proviso that state law may not be applied when it is 'inconsistent with the Constitution and laws of the United States.'"[258]

In subsequent decisions, the Supreme Court has applied § 1988(a) to other "Reconstruction Civil Rights Acts" claims under §§ 1981, 1983, 1985, and 1986.[259] Following *Robertson*, the Tenth Circuit has repeatedly applied § 1988(a) to § 1983 actions.[260] It has also applied § 1988(a) to § 1981 cases.[261] And during the 1990s, it also applied § 1988(a) to two Title

---

[256] 42 U.S.C. § 1988(a).

[257] *Robertson*, 436 U.S. at 589 (quoting *Moor v. County of Alameda*, 411 U.S. 693, 7032 n.14 (1973)).

[258] *Id.* at 589–90.

[259] *See Burnett v. Grattan*, 468 U.S. 42, 48 (1984); *Bd. of Regents of Univ. of State of N. Y. v. Tomanio*, 446 U.S. 478 (1980); *Chardon v. Fumero Soto*, 462 U.S. 650 (1983).

[260] *Berry v. City of Muskogee, Okl.*, 900 F.2d 1489, 1506 (10th Cir. 1990) (fashioning federal survivorship rule for § 1983 claim for wrongful death); *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (adopting state survivorship rule for § 1983 malicious prosecution action); *Oliveros v. Mitchell*, 449 F.3d 1091, 1095 n.1 (10th Cir. 2006); *Medina v. Pacheco*, 161 F.3d 18 (10th Cir. 1998) ("Survival of § 1983 actions after a plaintiff's death is governed by state law, as long as the state law is 'not inconsistent with the Constitution and laws of the United States.'"); *Smith v. Allbaugh*, 987 F.3d 905, 909 (10th Cir. 2021) ("Federal courts are to apply state law in deciding who may bring a § 1983 action on a decedent's behalf." (quoting *Williams v. Bradshaw*, 459 F.3d 846, 848 (8th Cir. 2006)); *Grandbouche v. Clancy*, 825 F.2d 1463, 1465 (10th Cir. 1987) (applying state survivorship rule to a § 1983 suit for an alleged First Amendment violation); *Pope v. Ward*, 94 F.3d 656 (10th Cir. 1996); *see also Blake v. Dickason*, 997 F.2d 749, 751 (10th Cir. 1993) (applying state statute of limitations for § 1983 claims); *Hopkins v. Oklahoma Pub. Emps. Ret. Sys.*, 150 F.3d 1155, 1159 (10th Cir. 1998) ("Hopkins filed his suit alleging constitutional claims under 42 U.S.C. § 1983. That statute's companion provision in 42 U.S.C. § 1988(a) provides that the federal courts' jurisdiction to decide a section 1983 suit will be governed by applicable state law when there is no controlling federal law on a particular point."); *Burke v. Regalado*, 935 F.3d 960, 1046 (10th Cir. 2019); *Blake v. Dickason*, 997 F.2d 749, 750 (10th Cir. 1993) ("Congress failed to specify a statute of limitations for civil rights claims under § 1983.").

[261] *Reynolds v. Sch. Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1532 (10th Cir. 1995) ("Section 1981 does not specify a time period in which claims under that statute must be brought. Accordingly, we look to analogous state law for a limitations period, 42 U.S.C. § 1988(a)."); *Roberts v. Roadway Exp., Inc.*, 149 F.3d 1098, 1110 (10th Cir. 1998); *Mobley v. Dillon Companies, Inc.*, 153 F.3d 727 (10th Cir. 1998); *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1104 (10th Cir. 2001).

VII actions.[262] Notably, Title VII is part of the Civil Rights Act of 1964—not the Reconstruction

Civil Rights Acts—and is not contained in "titles 13, 24, and 70 of the Revised Statutes."[263]

In *Slade for Estate of Slade v. U.S. Postal Service*, the Tenth Circuit held that the

"relevant law" to determine whether a Title VII claim survived the decedent's death was the state

statute for survival of personal injury actions.[264] The court cited to *Smith* for the proposition that

"[t]he question of the survival of an action grounded in federal law is governed by federal

common law when, as here, there is no expression of contrary intent."[265] But it then quoted from

a Seventh Circuit decision—a decision on a § 1983 claim, not a Title VII claim—for its next

sentence: "[I]f federal law does not provide a rule of decision in a civil rights case, federal law

will incorporate the appropriate state law, unless that law is 'inconsistent with the Constitution

and laws of the United States.'"[266] It then identified Oklahoma law as the "relevant law" and

applied it, finding that the claim survived the former plaintiff's death.[267]

In *Karnes v. SCI Colorado Funeral Services, Inc.*, the Tenth Circuit again applied

§ 1988(a) to a Title VII claim. This time, however, the circuit court engaged with the text of

§ 1988(a) and then applied the analysis from *Burnett v. Grattan*.[268] It found that the applicable

federal statute, 42 U.S.C. § 1981a, was not deficient and that, even if it had been, state law was

---

[262] *Karnes v. SCI Colorado Funeral Servs., Inc.*, 162 F.3d 1077, 1083 (10th Cir. 1998); *Slade*, 952 F.2d at 360.
[263] *See Nordwall v. PHC-LAS Cruces, Inc.*, 960 F. Supp. 2d 1200, 1240 n.23 (D.N.M. 2013) ("Title 13 of the Revised Statutes is codified in various sections of Titles 1, 18, 19, 28, 30, 31, 34, 39, 42, and 44 of the United States Code, Title 24 of the Revised Statutes is codified in Title 42 of the United States Code, and Title 70 of the Revised Statutes is codified in various sections of Titles 18, 38, 42, 43, 50 of the United States Code, but *none of these sections in Title 42 of the United States Code are within Title VII or the ADA.*" (emphasis added)).
[264] *Slade*, 952 F.2d at 360.
[265] *Id.* (quoting *Smith*, 876 F.2d at 834).
[266] *Id.* (quoting *Bennett v. Tucker*, 827 F.2d 63, 67 (7th Cir. 1987)).
[267] *Id.*
[268] *Burnett*, 468 U.S. at 47.

not consistent with federal law.[269] Therefore, state law did not provide the burden of proof for

punitive damages in Title VII actions.[270]

In the 1990s and 2000s, three other circuits applied § 1988(a) to ADA, Title VII, or

Rehabilitation Act ("RA") claims.[271] However, a modern trend is emerging in which circuit

courts find § 1988(a) inapplicable to causes of actions other than those provided by "provisions

of titles 13, 24, and 70 of the Revised Statutes."[272] Starting in 2017, three circuits have so found.

In 2017, the Eighth Circuit observed that, while "[a] number of courts have nonetheless

looked to § 1988(a) to address the survivability of ADA claims," § 1988(a) does not apply to the

ADA.[273] This is because § 1988(a) has "expressly limited application to actions brought under

'titles 13, 24, and 70 of the Revised Statutes,'" none of which include the ADA.[274]

A few months later, the Third Circuit considered whether § 1988(a) applied to violations

of the Fair Housing Act.[275] The Third Circuit examined the text of § 1988(a), reasoning that,

> On its face, the statute applies to certain statutes—those found
> within three Titles of the Revised Statutes, "titles 13, 24, and 70." If
> the Fair Housing Act had been contained within one of these three
> Titles, it would fall within Section 1988(a). Of course, the Fair
> Housing Act was enacted almost a century after the Revised
> Statutes. It was never codified in its Titles 13, 24 or 70. Therefore,
> Section 1988(a) by its plain meaning does not apply to the Fair
> Housing Act.[276]

The Third Circuit found this "text-based conclusion" was "consistent with the legislative history,

which shows that Section 1988(a) has always applied to designated statutes only. Section

---

[269] *Karnes*, 162 F.3d at 1080–82.

[270] *Id.* at 1083.

[271] *J.S. ex rel. Duck v. Isle of Wight Cnty. Sch. Bd.*, 402 F.3d 468, 474 (4th Cir. 2005) (applying § 1988(a) to Rehabilitation Act claim); *Holmes v. Texas A&M Univ.*, 145 F.3d 681, 684 (5th Cir. 1998) (applying § 1988(a) to ADA claim); *Hutchinson on Behalf of Baker v. Spink*, 126 F.3d 895, 898 (7th Cir. 1997) (same).

[272] 42 U.S.C. § 1988(a).

[273] *Guenther v. Griffin Constr. Co., Inc.*, 846 F.3d 979, 982 n.3 (8th Cir. 2017)

[274] *Id.* at 982 n.3.

[275] *Revock*, 853 F.3d 96.

[276] *Id.* at 106 (citations omitted).

1988(a) has never applied globally to any statute that could be labelled a 'civil rights' law."[277] Instead, it only applies to "the Reconstruction-era civil rights statutes, including what are now 42 U.S.C. §§ 1981, 1982 and 1983."[278]

The Ninth Circuit confronted the same issue in 2018, holding that § 1988(a) did not apply to ADA claims.[279] Like the Third Circuit, it turned to the statutory text: "According to the text of 42 U.S.C. § 1988(a) itself, the provision applies to 'civil and criminal matters' brought under the 'provisions of titles 13, 24, and 70 of the Revised Statutes,' which do not include the ADA and RA."[280] It then considered the legislative history of § 1988(a), observing that while Congress had frequently amended § 1988(b), it had not amended § 1988(a) since 1874.[281] "In short, § 1988(a) explicitly and unambiguously includes only certain civil rights statutes and omits others, such as the ADA and RA."[282] The court noted that "some circuits do apply § 1988(a) to civil rights statutes not explicitly listed," but that "[n]one of those opinions engage in any analysis of the actual statutory language of § 1988(a). Rather, they proceed apparently 'under the unsupported assumption that it applies broadly to any and all actions that could be characterized as sounding in 'civil rights.'"[283]

Whether or not the Tenth Circuit would come to the same conclusion regarding the ADA is not for this court to decide. *Slade for Estate of Slade v. U.S. Postal Service* is not dispositive because it concerned a Title VII claim under the Civil Rights Act of 1964, not a claim under the

---

[277] *Id.*
[278] *Id.* at 106–07.
[279] *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1057 (9th Cir. 2018).
[280] *Id.* at 1054.
[281] *Id.* at 1055.
[282] *Id.*
[283] *Id.* at 1055–56 (quoting *Lopez v. Regents of Univ. of Cal.*, 5 F.Supp.3d 1106, 1118 (N.D. Cal. 2013)). The Circuits that have "summarily conclude[d] that § 1988(a) applies to all civil rights legislation without discussing the textual limitations of § 1988(a)" include the Fourth, Fifth, Seventh, and Tenth Circuits. *See J.S. ex rel. Duck*, 402 F.3d at 474; *Holmes*, 145 F.3d at 684; *Hutchinson*, 126 F.3d at 898; *Slade*, 952 F.2d at 360.

Americans with Disabilities Act of 1991. But because the Tenth Circuit previously has applied § 1988(a) beyond the titles listed in its text, and because two district courts in the circuit have applied it to ADA claims,[284] the court applies the § 1988(a) analysis to Plaintiffs' ADA claims for the sake of completeness.[285] Both paths lead to the same place.

42 U.S.C. § 1988(a) "authorizes federal courts to undertake a three-step process to determine whether to borrow law from another source to aid their enforcement of federal civil rights statutes."[286] "Section 1988 first directs that courts look to federal law 'so far as such laws are suitable to carry [the civil and criminal civil rights statutes] into effect.'"[287] "Second, if federal law is 'not adapted to the object' or is 'deficient in the provisions necessary to furnish suitable remedies and punish offenses,' courts must consider borrowing the law of the forum state."[288] "Third, the federal court must reject the application of state law if it is 'inconsistent with the Constitution and laws of the United States.'"[289]

---

[284] *See Allred v. Solaray, Inc.*, 971 F. Supp. 1394, 1396 (D. Utah 1997) (applying § 1988(a) to ADA claims); *Rosenblum v. Colorado Dep't of Health*, 878 F. Supp. 1404, 1408 (D. Colo. 1994) (same); *see also Crane v. Utah Dep't of Corr.*, 2020 WL 556130, at *5 (D. Utah 2020) (applying state survival statute to ADA claims without mentioning § 1988(a)). The Tenth Circuit affirmed *Crane* in 2021, but did not address the issue of survivability, stating, "[w]e need not address this issue—or the parties' broader arguments about federal common law, our circuit's precedent, or the correct interpretation of Utah's survival statute—to resolve this claim." *Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1312 (10th Cir. 2021).

[285] Defendants cite to no cases in which any court in this circuit applied § 1988(a) to an FMLA claim, and this court is not aware of any. Further, even if § 1988(a) did apply to an FMLA claim, a state survival statute that would result in the claim's abatement in most or all cases would be inconsistent with the purposes of the federal statute. *See supra* text accompanying notes 245–250; 29 U.S.C. § 2617(a)(1) ("Congress was attempting to alleviate the economic burdens to both the employee and to his or her family of illness-related job-loss" [and] "attempting to prevent those with serious health problems from being discriminated against by their employers."). Like the ADA, many FMLA claims specifically involve plaintiffs who have a serious health problem, meaning that the "very nature of the [FMLA] makes it more likely the aggrieved party will die before the case is complete given the health issue which brings him or her under the statute's protection." *Guenther*, 846 F.3d at 984. Allowing a claim to abate upon the death of a plaintiff when one of the claim's elements is a serious health issue that increases the probability of death clearly would be inconsistent with the purposes of the FMLA.

[286] *Berry*, 900 F.2d at 1502.

[287] *Id.* (quoting 42 U.S.C. § 1988(a)).

[288] *Id.*

[289] *Id.*

When federal law does not cover a specific area, there is a "deficiency."[290] For example, there is a deficiency in federal law concerning the survivability of civil rights actions under § 1983—the law does not provide a federal rule.[291] The same is true for the ADA: "the ADA . . . [is] silent on whether claims brought under [it] abate at the time of a claimant's death."[292] Accordingly, federal law is deficient concerning the survivability of ADA claims.

Having determined that federal law is deficient, the court must turn to state statutes governing the survival of state actions. "[T]his state statutory law, modifying the common law, provides the principal reference point in determining survival of civil rights actions."[293] Utah's survivorship statute provides that "[a] cause of action arising out of personal injury to an individual . . . does not abate upon the death of the wrongdoer or the injured individual."[294] The statute does not define "personal injury to the individual."

In *Gressman v. State*, the Utah Supreme Court considered whether a factual innocence claim survived the death of the plaintiff.[295] The factual innocence statute did not address the survivability of claims, so the Court examined Utah's general survival statute to determine whether it supplanted the common law rule of abatement in the case.[296] It found that the "closest common law analogs to [the] factual innocence claim [we]re false imprisonment and malicious prosecution."[297] It observed that both claims were "categorized as torts against the person . . . because these torts infringe on an individual's personal liberty interests."[298] It considered how

---

[290] *Robertson*, 436 U.S. at 589.
[291] *Id.*
[292] *Crane*, 15 F.4th at 1312 (citing 42 U.S.C. § 12101-13).
[293] *Robertson*, 436 U.S. at 589–90.
[294] Utah Code Ann. § 78B-3-107(1)(a).
[295] *Gressman v. State*, 2013 UT 63, ¶ 23, 323 P.3d 998, 1005.
[296] *Id.* at ¶ 23.
[297] *Id.* at ¶ 24.
[298] *Id.* at ¶ 25.

other states and the U.S. Supreme Court have defined the claims as personal injury torts.[299] The Court noted that "the history and context of the adoption of the current version of the survival statute demonstrate[d] that the legislature did not intend that the statute be confined to actions for physical injury," especially "[i]n light of the well-established principle that a statutory reference to 'personal injury' claims includes all personal torts."[300] It determined that "'person' in the phrase 'personal injury to a person' emphasizes the inclusion of all personal tort claims in the survival statute."[301] "Taken as a whole, therefore, the definition of 'person' is broader than an individual's natural body and is necessarily coextensive with the 'interests of personality' vindicated by personal tort law."[302] Accordingly, because the claims' "common law analogs . . . are commonly included in the definition of actions for 'personal injury' or 'injury to the person' under survival statutes, and because a similar federal statutory claim has been defined as a personal injury action for the purposes of statutes of limitations, [the factual innocence] statutory claim survive[d] because it [wa]s an action for 'personal injury to a person.'"[303]

Here, Plaintiffs assert ADA claims. The Supreme Court directs that "the matter of characterization" of such claims is a question of federal law.[304] Section 1988(a)'s analysis is typically straight-forward for § 1983 and § 1981 claims because the Supreme Court has held that such claims are most like personal injury actions.[305] If § 1988(a) applies to ADA claims because they are "civil rights" causes of actions analogous to § 1983 and § 1981, it follows that ADA

---

[299] *Id.* at ¶¶ 26–27.
[300] *Id.* at ¶¶ 30–31.
[301] *Id.* at ¶ 33.
[302] *Id.* at ¶ 34.
[303] *Id.* at ¶ 28.
[304] *Wilson v. Garcia*, 471 U.S. 261, 269 (1985) (superseded by statute on other grounds); *Levy v. Kansas Dep't of Soc. & Rehab. Servs.*, 789 F.3d 1164, 1173 (10th Cir. 2015) ("[T]he question of how to characterize the federal cause of action is one of federal, not state law.").
[305] *Varnell v. Dora Consol. Sch. Dist.*, 756 F.3d 1208, 1212 (10th Cir. 2014); *see Goodman v. Lukens Steel Co.*, 482 U.S. 656, 661 (1987) (holding that § 1981 claims are characterized as personal injury actions).

claims also are characterized as personal injury claims. Further, there is a wealth of federal case law that ADA claims are "best characterized as one[s] for personal injury."[306] Therefore, the court characterizes the ADA claims as personal injury torts. This means that under Utah law, Plaintiffs' ADA claims are "cause[s] of action arising out of personal injury to an individual"[307] and that they "do[] not abate upon the death of . . . the injured individual."[308]

Further, even if Utah's survivorship statute resulted in Plaintiffs' ADA claims being abated, the claims would still survive because that result would be inconsistent with the ADA. "In resolving questions of inconsistency between state and federal law raised under § 1988, courts must look not only at particular federal statutes and constitutional provisions, but also at 'the policies expressed in [them].'"[309] "Of particular importance is whether application of state law 'would be inconsistent with the federal policy underlying the cause of action under consideration.'"[310] When a state law "'d[oes] not provide for survival of any tort actions,' or if it significantly restricts the types of actions that survive," it may be inconsistent with federal law.[311]

In *Robertson*, the Supreme Court found that a Louisiana survivorship statute was not inconsistent with federal policies even though it caused abatement of the claim because it had "no independent adverse effect on the policies underlying" the federal statute.[312] There, the

---

[306] *Soignier v. Am. Bd. of Plastic Surgery*, 92 F.3d 547, 551 (7th Cir. 1996); *Disabled in Action of Pennsylvania v. Se. Pennsylvania Transp. Auth.*, 539 F.3d 199, 208 (3d Cir. 2008); *Gaona v. Town & Country Credit*, 324 F.3d 1050, 1055 (8th Cir. 2003); *Everett v. Cobb Cnty. Sch. Dist.*, 138 F.3d 1407, 1409 (11th Cir. 1998); McCormick v. Miami Univ., 693 F.3d 654, 664 (6th Cir. 2012); *see also Levy v. Kansas Dep't of Soc. & Rehab. Servs.*, 789 F.3d 1164, 1172 (10th Cir. 2015) (finding Rehabilitation Act claims are best characterized as claims for personal injuries); *Baker v. Bd. of Regents of State of Kan.*, 991 F.2d 628, 631 (10th Cir. 1993) (same).

[307] Utah Code Ann. § 78B-3-107(1)(a).

[308] *Id.*

[309] *Robertson*, 436 U.S. at 590 (quoting *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 239 (1969)).

[310] *Karnes*, 162 F.3d at 1082 (quoting *Robertson*, 436 U.S. at 590).

[311] *Robertson*, 436 U.S. at 594.

[312] *Id.*

Louisiana statute barred the § 1983 action brought by the executor of the plaintiff's estate because the executor did not satisfy the statute's requirements in that he was not a spouse, child, parent, or sibling of the deceased plaintiff.[313] The abatement did not undermine § 1983's policies because the "goal of compensating those injured by a deprivation of rights provides no basis for requiring compensation of one who is merely suing as the executor of the deceased's estate."[314] Further, *most* § 1983 actions would survive the plaintiff's death under Louisiana's statute.[315]

In *Karnes v. SCI Colorado Funeral Services, Inc.*, the Tenth Circuit held that Colorado law was inconsistent with federal policies when it required punitive damages to be proven beyond a reasonable doubt.[316] This was because the federal legislation, Title VII, constituted "a broad remedial measure 'designed to assure equality of employment opportunities.'"[317] "By allowing the recovery of punitive damages, [the federal law] provides that in appropriate circumstances, damage awards in Title VII actions may serve to punish outrageous discriminatory conduct and to deter similar conduct in the future."[318] The high evidentiary burden imposed by Colorado law could not be "harmonized with the policy underlying" the federal law.[319] This burden was "generally inhospitable" to punitive damages claims, diminishing the "remedial and deterrent effects of punitive damage awards" and undermining important Congressional policies.[320]

Concerning the claims at issue here, "the broad, general purpose of the ADA [i]s to eliminate discrimination against people with disabilities."[321] To that end, the ADA prohibits

---

[313] *Id.* at 591.
[314] *Id.* at 592.
[315] *Id.*
[316] *Karnes*, 162 F.3d at 1082.
[317] *Id.* (quoting *Pullman Standard v. Swint*, 456 U.S. 273, 276 (1982)).
[318] *Id.* at 1082.
[319] *Id.*
[320] *Id.* at 1083.
[321] *Toomer v. City Cab*, 443 F.3d 1191, 1195 (10th Cir. 2006).

covered employers from "discriminat[ing] against a qualified individual on the basis of the disability in regard to . . . [the] terms, conditions, and privileges of employment."[322] If Utah law did not provide for *any* ADA claims to survive the death of the person with the disability, it would make Utah "generally inhospitable" to ADA claims. This is because "ADA claims specifically involve *disabled plaintiffs* alleging they were discriminated against *because of* their disability," meaning that the "very nature of the ADA makes it more likely the aggrieved party will die before the case is complete given the health issue which brings him or her under the statute's protection."[323] "Congress passed the ADA to eradicate discrimination against disabled persons, some of whom may be targeted precisely because of their poor health. A state law allowing claims to abate when the aggrieved party dies impedes this broad remedial purpose."[324]

Defendants point to a district court's discussion of Colorado's survivorship statute in *Rosenblum v. Colorado Department of Health*[325] for the proposition that the argument "that abatement of ADA claims would be inconsistent with the purposes of the ADA . . . has been rejected by courts in the Tenth Circuit."[326] However, in *Rosenblum*, the court was addressing solely the availability of damages after the plaintiff's death when the Colorado survivorship statute expressly limited the types of damages recoverable after a plaintiff's death[327]—not the entire ADA claim. *Rosenblum* does not change the analysis or the result here.

---

[322] 42 U.S.C. § 12112(a).

[323] *Guenther*, 846 F.3d at 984.

[324] *Id.*

[325] *Rosenblum*, 878 F. Supp. at 1409.

[326] Defs.'s Reply 5.

[327] *See* Colo. Rev. Stat. § 13–20–101(1) ("All causes of action, except actions for slander or libel, shall survive and may be brought or continued notwithstanding the death of the person in favor or against whom such action has accrued . . . and, in tort actions based upon personal injury, the damages recoverable after the death of the person in whose favor such action has accrued shall be limited to loss of earnings and expenses sustained or incurred prior to death and shall not include damages for pain, suffering, or disfigurement, nor prospective profits or earnings after date of death.").

In conclusion, federal common law would allow Plaintiffs' ADA and FMLA claims to survive because they are remedial, and the application of § 1988(a) to Plaintiffs' ADA claims does not result in a different outcome. Therefore, Plaintiffs' ADA and FMLA claims did not abate on Mr. Randall's death.

### III.   Plaintiffs' Intentional Infliction of Emotional Distress Claims Fail Because Defendants' Conduct Was Not Outrageous as a Matter of Law.

"Under Utah law, a plaintiff must prove four elements to establish an intentional infliction of emotional distress claim: '(i) the [defendant's] conduct [complained of] was outrageous and intolerable in that it offended . . . generally accepted standards of decency and morality; (ii) [the defendant] intended to cause, or acted in reckless disregard of the likelihood of causing, emotional distress; (iii) [the plaintiff] suffered severe emotional distress; and (iv) [the defendant's] conduct proximately caused [the] emotional distress."[328] "If the trial court determines that a defendant's conduct was not outrageous as a matter of law, then the plaintiff's claim fails, and a court may properly grant the defendant summary judgment on an intentional infliction of emotional distress claim."[329]

"A court is to determine whether a 'defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery.'"[330] "[C]onduct is not outrageous simply because it is 'tortious, injurious, or malicious, or because it would give rise to punitive damages, or because it is illegal.'"[331] Similarly, conduct is not outrageous because it is "unreasonable, unkind, or unfair."[332] "In the employment context, . . . liability . . . may be found only where the

---

[328] *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 37, 56 P.3d 524, 535–36 (quoting *Retherford v. AT & T Communications of the Mountain States, Inc.*, 844 P.2d 949, 970–71 (Utah 1992)) (alterations in original).
[329] *Oman v. Davis Sch. Dist.*, 2008 UT 70, ¶ 52, 194 P.3d 956, 969 (quoting *Prince*, 2002 UT 68 at ¶ 38).
[330] *Prince*, 2002 UT 68 at ¶ 38 (quoting *Schuurman v. Shingleton*, 2001 UT 52, ¶¶ 24–25, 26 P.3d 227).
[331] *Id.* at ¶ 38 (quoting *Franco v. Church of Jesus Christ of Latter-day Saints*, 2001 UT 25, ¶ 28, 21 P.3d 198).
[332] *Id.* (quoting *Franco*, 2001 UT 25 at ¶ 28).

conduct complained of has been so extreme in degree as to go beyond all possible bounds of decency."[333]

"While termination can be an emotionally distressing event in one's life, mere termination alone does not constitute the intentional infliction of emotional distress."[334] This is because, "[u]ndoubtedly, every employee who believes he has a legitimate grievance concerning his discharge from employment experiences some emotional anguish as a result of that belief."[335] Only when the termination involves additional circumstances that make the employer's acts "go beyond all possible bounds of decency" do Utah courts permit the claim to go to the jury.

For example, the Utah Supreme Court, in *Retherford v. AT & T Communications of Mountain States, Inc.*, held that "months of persecution by [] co-workers," in which the co-workers "shadowed [the plaintiff's] movements, intimidated her with threatening looks and remarks, and manipulated circumstances at her work in ways that made her job markedly more stressful, all in retaliation for her good-faith complaint of sexual harassment"[336] were sufficient to "reasonably be regarded as so extreme and outrageous as to permit recovery.'"[337] And in *Cabaness v. Thomas*, the Court found a jury could determine that a supervisor's conduct was outrageous where he "consistently verbally harassed, intimidated, and ridiculed the employees he supervised," "made the work of his subordinates harder without providing any justification for doing so," "evinced a disregard for safety procedures," "regularly threatened to fire" employees, "insult[ed] and demean[ed] [the plaintiff] by, among other things, calling him 'dumbass,' 'jackass,' and 'asshole,' and using cutting sarcasm," told the plaintiff to "get rid of [his] wife,"

---

[333] *Oman*, 2008 UT 70 at ¶ 53 (quoting 45 Am.Jur.2d *Proof of Facts* 261 (1986)).
[334] *Larson v. SYSCO Corp.*, 767 P.2d 557, 561 (Utah 1989); *Sperber v. Galigher Ash Co.*, 747 P.2d 1025, 1028 (Utah 1987) ("Mere discharge from employment does not constitute outrageous or intolerable conduct by an employer.").
[335] *Sperber*, 747 P.2d at 1029.
[336] *Retherford*, 844 P.2d at 978.
[337] *Prince*, 2002 UT 68 at ¶ 38 (quoting *Schuurman*, 2001 UT 52 at ¶¶ 24–25).

"knee[d] an employee in the groin with enough force to cause the employee to fall to the floor in pain," and "singled . . . out [the plaintiff who had just returned after a leave of absence for depression] in an employee meeting, threatened to fire him, and criticized him about personal issues in front of other employees."[338] On the opposite end of the spectrum, the Court found that being discharged and given "a false reason for [the] dismissal" was insufficient for establishing a genuine issue of material fact regarding "outrageous" conduct.[339]

Plaintiffs argue that their IIED claim is not solely based on Mr. Randall's termination,[340] but they cite no Utah case permitting an IIED claim on facts similar to their own.[341] And, considering the evidence, there are no parallels between the facts in this case and the facts in the cases where the Utah Supreme Court has found sufficient evidence for a jury to determine whether certain conduct is "outrageous." Viewed in the light most favorable to Plaintiffs, the evidence would permit a reasonable fact finder to determine that Mr. Randall was an employee who mostly performed satisfactorily, but who regularly failed to meet the benchmark set for his

---

[338] *Cabaness v. Thomas*, 2010 UT 23, ¶¶ 6–12, 232 P.3d 486, 494.

[339] *Sperber*, 747 P.2d at 1028.

[340] *See* Compl. ¶ 69; Pls.'s Mot. Summ. J. 68 ("Importantly, there are three things that show that Smith and Edwards actions were outrageous and intolerable. First, Smith and Edwards discriminated against Kevin based upon his disability and violated federal law designed specifically to protect people like Kevin by firing him while in need of medical care. Second, Smith and Edwards repeatedly assured Kevin that he would not be fired, that it would work with him and that he would have a job after his transplant procedures. Yet, when Kevin was at his sickest and at the top of the liver transplant list, Smith and Edwards broke these promises and betrayed Kevin. Third, Smith and Edwards terminated Kevin with full knowledge that Kevin was at the top of the liver transplant list, reliant on Smith and Edwards insurance, and that his insurance would terminate two days after he was fired—leaving Kevin (who was dying) to fend for himself and find insurance."). The court notes that there is a lack of any identified record evidence that supports Plaintiffs' theory that Smith & Edwards repeatedly promised Mr. Randall it would not fire him. Nor have Plaintiffs' presented evidence that Smith & Edwards knew Mr. Randall would not elect COBRA coverage or that he would lose his place on the transplant list, principal drivers of their IIED claim.

[341] In their opposition to Defendant's Motion for Summary Judgement, their Motion for Summary Judgment, and their reply in support of their motion, Plaintiffs only city to one Utah Supreme Court case on an IIED claim in the employment context on the issue of outrageousness. And in that case, *Larson v. SYSCO Corp.*, the Utah Supreme court held that an employee terminated for poor performance did not have an IIED claim against his employer. 767 P.2d 557, 561 (Utah 1989). Plaintiffs also cite to a Tenth Circuit case applying Colorado law, *Riske v. King Soopers*, 366 F.3d 1085, 1090 (10th Cir. 2004), and a Utah court of appeals case about a lawyer who lured a client into a sexual relationship, *Walter v. Stewart*, 2003 UT App 86, ¶ 29, 67 P.3d 1042, 1049. Neither of those cases are relevant to the issue of whether the Utah Supreme Court would consider Smith & Edwards, Mr. Peek, or Ms. Woodland's actions toward Mr. Randall as sufficiently outrageous to permit an IIED claim.

production of product imports and who—at least during the first year of his employment—failed to follow company policy regarding personal cell phone use, social media use, and chatting with coworkers. Two and a half years into his employment, while Mr. Randall was waiting on a liver transplant, Smith & Edwards set a requirement for Mr. Randall's production that was very high for him, knowing Mr. Randall had never produced at that level. Mr. Randall failed to meet the new requirement and Defendants fired him, knowing that would mean he would lose his employer's contribution to his health insurance benefit. The fact finder could also determine that his termination was in violation of the ADA and the FMLA.

While reasonable minds could find this evidence of Defendants' actions toward Mr. Randall to be "unreasonable, unkind, or unfair"[342] and even illegal,[343] they could not reasonably differ regarding whether Defendants' actions can "be regarded as so extreme and outrageous as to permit recovery."[344] Firing Mr. Randall at the time in question was undoubtedly unkind and may have been unfair and unreasonable as well; but it does not meet the standard set by case law for actions "utterly intolerable in a civilized community."[345] Unlike *Retherford* and *Cabaness*, there is not a "continuous and ongoing pattern" of "insult[s], indignit[ies], or threat[s]."[346] Mr. Randall was an at-will Web Store Associate at a company experiencing much higher than usual online sales who was not performing at the level the company desired. His termination was not the culmination of months of verbal abuse or persecution. Even accompanied by the serious circumstances—Mr. Randall's liver disease and the loss of his employer's contribution to his

---

[342] *Prince*, 2002 UT 68 at ¶ 38 (quoting *Franco*, 2001 UT 25 at ¶ 28).

[343] *See id.* ("[C]onduct is not outrageous simply because it is 'tortious, injurious, or malicious, or because it would give rise to punitive damages, or because it is illegal.'" (quoting *Franco*, 2001 UT 25 at ¶ 28)).

[344] *Id.* (quoting *Schuurman*, 2001 UT 52 at ¶¶ 24–25).

[345] *Retherford*, 844 P.2d at 978 n.19.

[346] *Cabaness*, 2010 UT 23 at ¶ 38.

health insurance benefit—Defendants' conduct does not meet the "outrageous, intolerable and offensive" standard under Utah law.[347]

Plaintiffs argue that "[t]he District of Utah has already determined that under Utah law disability discrimination is a sufficient basis for an IIED claim."[348] But the argument that any claim of disability discrimination, no matter the record evidence, categorically results in an IIED claim that goes to the jury is not supported. In *Richardson v. Valley Asphalt*, the complaint alleged Defendants fired plaintiff shortly after he disclosed his AIDS diagnosis, telling plaintiff's wife that "no one wanted to work with her husband because he had AIDS," and threatening her to make her husband withdraw his claim for unemployment benefits.[349] The district court likened the allegations to the sexual harassment alleged in *Retherford v. AT&T Communications,*[350] discussed above, in which the plaintiff alleged "months of persecution by her co-workers . . . in retaliation for her good-faith complaint of sexual harassment."[351] Plaintiffs here do not have any admissible evidence of harassment on the basis of Mr. Randall's disability. In short, the facts of this case do not rise to the level of those in *Richardson* or *Retherford*.

Defendants are granted judgment on Plaintiffs' IIED claims.[352]

## IV.   There Are Genuine Issues of Material Fact that Preclude Summary Judgment on Plaintiffs' Claims under the Americans with Disabilities Act.

"In general, the ADA provides that '[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms,

---

[347] *Id.* at ¶ 45.

[348] Pls.'s Mot. Summ. J. 68.

[349] *Richardson v. Valley Asphalt, Inc.*, 109 F. Supp. 2d 1332, 1338–39 (D. Utah 2000).

[350] *Id.* at 1340.

[351] *Retherford*, 844 P.2d at 978.

[352] Defendants also argue that Plaintiffs' claims for Intentional Infliction of Emotional Distress are "barred as a matter of law by the exclusive remedy provisions of Utah's Workers Compensation Act" ("UWCA"). Defs.'s Mot. Summ. J. 16. The court need not resolve this issue because the IIED claims are not cognizable.

conditions, and privileges of employment.'"[353] An employer may violate the ADA by discriminating against an employee on the basis of the employee's disability or "by not making reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability."[354]

Plaintiffs allege that Defendants both (A) discriminated against Mr. Randall on the basis of his disability and (B) failed to provide reasonable accommodation to Mr. Randall.

### A.   There Is a Genuine Dispute of Material Fact as to Whether Defendants Discriminated Against Mr. Randall on the Basis of His Disability.

Under *McDonnell Douglas*'s three-part analysis, "[t]o establish a prima facie case under the ADA, a plaintiff must demonstrate: (1) that she is a disabled person within the meaning of the ADA, (2) that she is qualified, that is, she is able to perform the essential functions of the job, with or without reasonable accommodation, and (3) that the employer terminated her employment under circumstances which give rise to an inference that the termination was based on her disability."[355]

The parties dispute whether Mr. Randall had a disability within the meaning of the ADA, whether he was qualified to perform the essential functions of the Web Store Associate position, and whether he can show that Smith & Edwards terminated him under circumstances that give rise to an inference that the termination was based on his ESLD. The court discusses each in turn.

---

[353] *Punt v. Kelly Servs.*, 862 F.3d 1040, 1047–48 (10th Cir. 2017) (quoting 42 U.S.C. § 12112(a)).
[354] *Id.* at 1048.
[355] *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (citing *MacDonald v. Delta Air Lines, Inc.*, 94 F.3d 1437, 1443 (10th Cir. 1996); *White v. York Int'l Corp.*, 45 F.3d 357, 361 n.6 (10th Cir. 1995)).

1.   *There Is a Genuine Issue of Material Fact as to Whether Plaintiffs Have Established a Prima Facie Case of Disability Discrimination.*

a.   There Is a Genuine Issue of Material Fact as to Whether Mr. Randall Had a Disability for Purposes of the Americans with Disabilities Act.

Under the ADA, "[t]he term 'disability' means, with respect to an individual . . . a physical or mental impairment that substantially limits one or more major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment."[356] "To satisfy this definition, 'a plaintiff must (1) have a recognized impairment, (2) identify one or more appropriate major life activities, and (3) show the impairment substantially limits one or more of those activities.'"[357] "Whether a plaintiff has met the first two requirements are questions of law for the court."[358] "But whether the impairment substantially limits a major life activity is ordinarily a question of fact for the jury."[359]

i.   Mr. Randall Had a Physical Impairment.

"The ADA does not define the term 'physical or mental impairment.'"[360] Under the definition promulgated by the Equal Employment Opportunity Commission in its regulations issued to implement Title 1 of the ADA,

Physical or mental impairment means . . . [a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, *digestive*, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine . . . .[361]

---

[356] 42 U.S.C. § 12102(1).
[357] *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1142 (10th Cir. 2011) (quoting *Berry v. T–Mobile USA, Inc.*, 490 F.3d 1211, 1216 (10th Cir. 2007).
[358] *Id.* (citing *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003)).
[359] *Id.*
[360] *Id.*
[361] 29 C.F.R. § 1630.2(h) (emphasis added).

Plaintiffs have submitted evidence showing Mr. Randall had a physiological condition affecting his digestive system during some of the time period in question: he was diagnosed with End Stage Liver Disease in October 2019.[362] Defendants do not dispute this, nor argue that this is not a physical impairment under the ADA.

ii.   Record Evidence Supports a Finding that Mr. Randall's Impairment Affected at least One Major Life Activity.

The next question is whether Plaintiffs have identified at least one "major life activity" that was affected by Mr. Randall's impairment. A "major life activity" may be "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, *walking*, standing, lifting, bending, speaking, breathing, *learning,* reading, *concentrating, thinking*, communicating, and *working*."[363]

The undisputed record evidence supports a finding that Mr. Randall's ESLD affected at least one major life activity. Mr. Myrick testified that Mr. Randall had encephalopathy as a result of ESLD.[364] "[T]he unscientific term for [encephalopathy] is foggy thinking. [Affected individuals] just don't think clearly."[365] Mr. Randall experienced difficulty concentrating.[366] Sometimes, he had to "really think about" simple questions.[367] As the disease progressed, he got worse and worse.[368] He had a "hard time concentrating" and was "very, very forgetful."[369] In Mr. Randall's November 9, 2019 "Employee Warning Notice," Ms. Woodland wrote that Mr. Randall was "fail[ing] to follow directions given verbally [and] listed in the Notes google

---

[362] Medical Progress Notes Oct. 9, 2019, ECF No. 81-1 at 453.
[363] 42 U.S.C. § 12102(2)(A) (emphasis added).
[364] Myrick Dep. 59:8–59:10.
[365] *Id.* at 58:4–58:6.
[366] Randall Dep. 65:13–65:16.
[367] *Id.* at 65:14–65:15.
[368] *Id.* at 93:16–93:19.
[369] *Id.* at 93:16–93:17.

doc."[370] In other words, there is evidence that Mr. Randall's ESLD may have affected his ability to learn, concentrate, think, and, by extension, work—four major life activities.

There also is record evidence that Mr. Randall "had swelling in his abdomen and legs."[371] This made it "difficult for him to go up and down the stairs."[372] This affected his ability to perform the "major life activity" of walking. In short, the uncontroverted record evidence supports a finding that Mr. Randall's ESLD affected at least one major life activity.

> ### iii. There Is a Genuine Issue of Material Fact as to Whether Mr. Randall's Impairment Substantially Limited a Major Life Activity.

"The final element of the ADA's definition of disability describes the relationship that must exist between the first two elements."[373] "A disability exists under the statute only where a physical or mental impairment 'substantially limits' a major life activity."[374] "An impairment is substantially limiting when it renders an individual either unable or significantly restricted in her ability to perform a major life activity 'compared to the average person in the general population.'"[375] "Three factors govern this inquiry: '(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact or the expected permanent or long term impact of or resulting from the impairment.'"[376]

> Although "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are *usually* not disabilities," "an impairment does not necessarily have to be permanent to rise to the level of a disability. Some conditions may be long-term, or potentially long-term, in that their duration is

---

[370] Employee Warning Notice Nov. 7, 2019, ECF No. 79-5.
[371] Myrick Dep. 59:11–59:13.
[372] Parker Dep. 16:15–16:18.
[373] *Carter*, 662 F.3d at 1143.
[374] *Id.* (quoting 42 U.S.C. § 12102(1)(A)).
[375] *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1218 (10th Cir. 2010) (quoting *Doebele*, 342 F.3d at 1130).
[376] *Carter*, 662 F.3d at 1145 (quoting *Doebele*, 342 F.3d at 1130).

> indefinite and unknowable or is expected to be at least several
> months. Such conditions, if severe, may constitute disabilities."[377]

"Because this is a factual determination, the relevant question . . . is whether [the plaintiff] has

presented enough evidence to create a genuine dispute as to any material fact that necessitates

resolution by a jury."[378]

Plaintiffs have submitted evidence that Mr. Randall was diagnosed with ESLD seven

months before his termination from Smith & Edwards,[379] and the disease resulted in his death

just a few months after his termination.[380] Mr. Randall reportedly experienced encephalopathy,

fatigue, and swelling in his abdomen and legs as symptoms of the disease.[381] There is record

evidence from which a fact finder could determine that these symptoms impacted his ability to

think, learn, concentrate, work, and walk. The expected duration of the impairment was "until

liver transplant,"[382] which as of February 2020, was estimated to be seven to nine months.[383]

There was a high likelihood of no permanent or long-term impact from the impairment as long as

Mr. Randall received a transplant.[384]

"Taken together, there is enough evidence in the record for a jury to conclude that [Mr.

Randall's] impairments substantially limited his ability to [learn, think, concentrate, work, and

walk] in comparison to the abilities of an average person."[385] Even though his ESLD was not

expected to be permanent, it persisted for almost a year after diagnosis and it eventually was

---

[377] *Aldrich v. Boeing Co.*, 146 F.3d 1265, 1270 (10th Cir. 1998) (citing 29 C.F.R. § 1630.2(j); EEOC, *Interpretive Manual* (1995), *reprinted in 2 EEOC Compliance Manual* § 902.4(d), at 902–30 (BNA 1997)) (emphasis in original).
[378] *Carter*, 662 F.3d at 1143 (citing *Doebele*, 342 F.3d at 1129).
[379] Medical Progress Notes Oct. 9, 2019, ECF No. 81-1 at 453; Certification 2.
[380] Randall Aff. ¶ 24.
[381] Myrick Dep. 59:8–59:13; Woodland Dep. 134:18–134:22, 145:6–145:10, 146:18–146:20.
[382] Certification 2.
[383] Myrick Dep. 38:4–38:8.
[384] Gilroy Dep. 14:6–14:8, 20:21–21:11 ("As a general rule, they return to a normal life."); *id.* at 50:5–50:7 ("They don't meet criteria for disability once they've been transplanted is probably a better way to put it.").
[385] *Carter*, 662 F.3d at 1145.

severe enough to result in Mr. Randall's death. This is enough evidence for a reasonable jury, if it credits the evidence, to find that Mr. Randall's ESLD substantially limited a major life activity.

> b. There Is a Genuine Issue of Material Fact as to Whether Mr. Randall Was Qualified to Perform the Essential Functions of His Job.

"The ADA defines a 'qualified individual with a disability' as 'an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'"[386] "As a condition to performing the essential functions of an employment position, however, an individual must first satisfy 'the requisite skill, experience, education and other job-related requirements of the employment position.'"[387] "If a plaintiff fails to establish that he has met either step of this analysis, he is not a 'qualified individual' within the meaning of § 12111(8)."[388]

Defendants argue that "Mr. Randall was not a qualified individual because he could not perform the essential functions of his job, which included 200–250 product [imports] per month."[389] Plaintiffs respond that the number of product imports or descriptions is not an essential function of the job; the *task*—creating product imports—is.[390] They argue that "the [number] of product uploads was inconsistent, varied among employees based upon their capabilities, [the task was] not time sensitive, and the goals were a moving target," "undermin[ing] Defendants' assertion that the product upload [number] was 'essential.'"[391]

"The plaintiff bears the burden of showing she is able to perform the essential functions of her job."[392] "'Essential functions' are 'the fundamental job duties of the employment position

---

[386] *Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 992–93 (10th Cir. 2001) (quoting 42 U.S.C. § 12111(8)).
[387] *Id.* (quoting 29 C.F.R. § 1630.2(m)).
[388] *Id.*
[389] Defs.'s Opp'n 24.
[390] Pls.'s Reply 30.
[391] Pls.'s Reply 30.
[392] *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1119 (10th Cir. 2004) (citing *US Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002)).

the individual with a disability holds or desires.'"[393] "Evidence of whether a particular function is essential to a job includes (but is not necessarily limited to) (1) the employer's judgment as to which functions are essential, (2) written job descriptions prepared before advertising or interviewing applicants for the job, (3) the consequences of not requiring the incumbent to perform the function, and (4) the current work experience of incumbents in similar jobs."[394] "The question of whether a job requirement is a necessary requisite to employment initially focuses on whether an employer actually requires all employees in the particular position to satisfy the alleged job-related requirement."[395] "Provided that any necessary job specification is job-related, uniformly-enforced, and consistent with business necessity, the employer has the right to establish what a job is and what is required to perform it."[396] "The question of whether an employee can perform the essential functions of her job is a mixed question of law and fact."[397]

Turning to the record evidence, Smith & Edwards' "Web Store Associate" job description states that "responsibilities may include: [w]riting product descriptions, [p]roviding customer support online, via email, and via phone, [c]ontacting manufacturers to obtain product information, [and] [r]e-sizing images and other related tasks."[398] After Mr. Randall's ESLD diagnosis, Ms. Woodland felt that Mr. Randall could still perform the functions of his job and had no concern that he was unable to perform the functions of his job because "[h]e never gave me cause for concern."[399] Ms. Woodland states that there was a minimum number of product imports that each employee had to do, but "[i]t varied per individual"[400] based on their

---

[393] *Id.* (quoting 29 C.F.R. § 1630.2(n)(1)).
[394] *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 887 (10th Cir. 2015) (quoting *Wells v. Shalala*, 228 F.3d 1137, 1144 (10th Cir. 2000)).
[395] *Tate*, 268 F.3d at 993.
[396] *Id.*
[397] *Mason*, 357 F.3d at 1122 (citing *Rascon v. U.S. West Comm., Inc.*, 143 F.3d 1324, 1333 (10th Cir. 1998)).
[398] Web Store Associate Job Description 1, ECF No. 79-4 at 1.
[399] Woodland Dep. 115:1–115:8.
[400] *Id.* at 33:9–33:11.

"demonstrated . . . ability" to produce a certain number per month.[401] Ms. Woodland set Mr.

Randall's minimum number of product imports as "200 to 250, depending on how many weeks

were in the month."[402] However, unlike product imports, there was not a requirement for number

of written descriptions until Mr. Randall's June 2020 Final Warning.[403] He had averaged 52

written descriptions per month over some unknown period of his employment.[404] There is

evidence that Mr. Randall continued to write adequate product descriptions until his

termination—the stated issue was the quantity.[405]

Regarding the "consequences of not requiring the incumbent to perform the function,"

there is no indicated record evidence that Smith & Edwards was falling behind on its yearly SKU

goals between March and June 2020, and there is evidence that two other employees—Ms.

Woodland and Jordan Borgschatz—also performed this task and that Ms. Woodland could

complete an SKU in seven to ten minutes.[406] A reasonable jury could infer that the consequences

of not requiring Mr. Randall to perform the function (assuming the *number* of written product

descriptions is a function) were negligible.

Considering "the current work experience of incumbents in similar jobs," the other Web

Store Associates—only one of whom overlapped with Mr. Randall's employment—did not have

a requirement to produce a certain number of written descriptions, but when Ms. Woodland

compiled an average, it is clear that other employees completed far more than Mr. Randall, with

---

[401] *Id.* at 34:14–34:21.
[402] *Id.* at. 33:16–33:19.
[403] *Id.* at 37:9–37:10, 42:6–42:8.
[404] *Id.* at 40:6–40:12.
[405] *Id.* at 132:23–133:9 (messaging Mr. Randall on April 29, 2020, "You've been doing a great job and taking care of e-mails and it looks as though you've been pretty good at writing descriptions and all that jazz. Keep up the great work and keep me in the loop with what is going on medically so we can work with you the best way possible."); *id.* at 150:2–150:12.
[406] *Id.* at 32:12–32:23.

another full-time employee averaging 223 and a part-time (29–30 hours per week) employee averaging 121.[407]

Next, assuming Mr. Randall could not perform an essential function of his job based on the fact that he was not meeting the required number of written descriptions, there is evidence that with an accommodation, Mr. Randall could meet a pro-rated requirement of written descriptions. Mr. Randall wrote four to five descriptions per day over his last two weeks of employment,[408] which equates to 80–100 per month. Ms. Woodland stated that the quality of Mr. Randall's written descriptions was sufficient.[409] A reasonable jury could conclude that had Mr. Randall been granted the ability to work part-time, and his requirement for written descriptions diminished proportionately, he would have been able to perform that function of his job with the accommodation.

Plaintiffs have provided sufficient evidence that Mr. Randall was qualified, to require submission to the jury. While producing product imports and creating written descriptions were certainly "essential functions" of Mr. Randall's job, there is evidence from which a reasonable jury could conclude that the specific number of written descriptions was not an essential function of the Web Store Associate position. Of course, the fact finder could also find that there was some minimum number of written descriptions and that minimum number was higher than that produced by Mr. Randall, especially considering the evidence of other employees' higher outputs.[410]

---

[407] *Id.* at 39:6–39:9; Defs.'s Resp. to Pls.'s First Set of Disc. Reqs. 14. With the exception of one part-time Web Store Associate hired in September 2019 (Jordan Borgschatz), there were no other Web Store Associates employed concurrently with Mr. Randall. All evidence of other associates' experiences, with the exception of Mr. Borgschatz, is evidence from associates who began their employment with Smith & Edwards after Mr. Randall's termination.
[408] *Id.* at 142:19–142:25.
[409] *Id.* at 132:23–133:9, 150:2–150:12.
[410] *Id.* at 38:15–39:11 (testifying to other employees' average monthly written descriptions outputs as ranging from 121–223).

c. There Is Record Evidence to Support a Finding that Mr. Randall Suffered an Adverse Employment Action Because of His ESLD.

"In order to demonstrate 'discrimination,' a plaintiff generally must show that he has suffered an adverse employment action because of the disability."[411] "Because the statute only prohibits discrimination 'on the basis of disability,' there must be a nexus between the disability and the adverse employment action. In other words, it is not enough that an adverse employment action is suffered by an individual with a disability; rather, the disabled individual must show that the adverse action was 'on the basis of' the disability."[412] This requires that the plaintiff "present some affirmative evidence that disability was a determining factor in the employer's decision. This burden is not onerous, but it is also not empty or perfunctory."[413] "[T]he plaintiff must show that she was terminated because of her disability, or that the employer terminated the plaintiff 'under circumstances which give rise to an inference that the termination was based on her disability.'"[414] "The plaintiff must present evidence that, if the trier of fact finds it credible, and the employer remains silent, she would be entitled to judgment as a matter of law."[415]

The timing of Mr. Randall's termination could give rise to an inference that his termination was based on his ESLD. "'[P]rotected conduct closely followed by adverse action may justify an inference of retaliatory motive' even though [the Tenth Circuit] ha[s] 'rejected attempts to unduly stretch the 'close temporal proximity' required under this standard."[416] Even when "temporal proximity of . . . events may be insufficient, standing alone, to raise an

---

[411] *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1038 (10th Cir. 2011).
[412] *Punt*, 862 F.3d at 1048.
[413] *Bateman v. Nexstar Media Grp., Inc.*, 2021 WL 4520982, at *3 (10th Cir. 2021) (quoting *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1259 (10th Cir. 2001)).
[414] *Butler*, 172 F.3d at 748 (quoting *Morgan*, 108 F.3d at 1323).
[415] *Morgan*, 108 F.3d at 1323–24 (citing *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 59 (4th Cir. 1995))
[416] *Butler*, 172 F.3d at 752 (quoting *Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 329 (10th Cir. 1996)); *see Selenke*, 248 F.3d at 1260 (finding "within a month" provides support for pretext).

inference" of being based on the employee's disability, "in combination with . . . additional circumstantial evidence," it may create genuine issues of material fact.[417] Mr. Randall notified Defendants of his ESLD diagnosis in October 2019.[418] In March 2020, he completed FMLA paperwork, on which his physician specified that he would need 12 weeks to recover from transplant surgery.[419] Ms. Woodland and Mr. Peek understood that Mr. Randall's plan was to take leave for his transplant surgery and recovery.[420] Throughout April, Ms. Woodland knew Mr. Randall was third on the transplant list.[421] Ms. Woodland continued to request updates from Mr. Randall about his transplant status.[422] He was fired on June 29, 2020, the same day he received his first liver offer.[423] The temporal proximity of his impending transplant surgery and his termination could support an inference of pretext.

Further, the record evidence shows that at the same time Ms. Woodland was planning for Mr. Randall to be on leave for 12 weeks due to his ESLD, Smith & Edwards was experiencing a 65 to 75 percent increase in online orders.[424] The workload "became much more difficult to manage" when one of the two Web Store Associates was out.[425] Ms. Woodland believed that, due to budgetary reasons, she could not hire another Web Store Associate.[426] This could give rise to an inference that the action was based on Mr. Randall's ESLD, because Ms. Woodland feared that Mr. Randall's absence due to his liver condition would be unmanageable.[427] Once Mr.

---

[417] *Butler*, 172 F.3d at 752.
[418] Peek Dep. 49:6–49:11; Defs.'s Resp. to Pls.'s First Set of Disc. Reqs. 8, ECF No. 79-2 at 9.
[419] Peek Dep. 61:19–61:21.
[420] Woodland Dep. 115:9–115:21; Peek Dep. 55:13–55:22.
[421] Woodland Dep. 127:10–127:19, 131:19–132:11.
[422] *Id.* at 127:10–127:19, 131:19–132:11, 132:23–133:9, 135:12–135:14, 138:21–139:5.
[423] Randall Dep. 69:3–69:8, 98:8–98:16.
[424] Woodland Dep. 45:9–45:24.
[425] *Id.* at 47:19–47:24.
[426] *Id.* at 47:19–48:16.
[427] Of course, the record evidence also could give rise to the inference that Ms. Woodland was motivated by Mr. Randall's performance: there is evidence that Mr. Randall produced many fewer product imports and written descriptions, on average, than any other Web Store Associate and than Ms. Woodland desired. *See* Defs.'s Resp. to Pls.'s First Set of Disc. Reqs. 12–14.

Randall was fired, Ms. Woodland would have the budget to hire another Web Store Associate who would not need leave due to a disability.

This is sufficient for a prima facie case. Because Plaintiffs have shown that there is an issue of material fact as to Mr. Randall's disability, evidence of an adverse employment action, and sufficient evidence that suggests Mr. Randall's ESLD could have been a determining factor in the employment decision, they have met their prima facie burden.

### 2. Defendants Offered a Legitimate, Nondiscriminatory Reason for Terminating Mr. Randall.

"Having established her prima facie case, the burden under *McDonnell Douglas* then shifts to [Defendants] to demonstrate a legitimate, nonretaliatory reason for [the] termination decision."[428] This is an "exceedingly light" burden.[429] An employee's "poor job performance, poor attitude, and failure to maintain adequate job-related skills" can be legitimate reasons.[430]

Here, Defendants argue that they fired Mr. Randall because "of his poor performance."[431] Defendants point to Mr. Randall's HR record, in which his supervisor documented numerous times that Mr. Randall struggled to fully meet the volume of work job requirements. For example, in two of Mr. Randall's 2018 performance evaluations he only received a "Meets Minimum Requirements" mark for his volume of work.[432] Defendants also point to the fact that Mr. Randall had issues with the quality of his work. In November 2019, Mr. Randall received a Final Warning for the quality of his work; among many other deficiencies on a spreadsheet, he had not marked firearms as "restricted shipping" items.[433] In preparation for litigation, Ms.

---

[428] *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1172 (10th Cir. 2006) (citing *Doebele*, 342 F.3d at 1135).
[429] *C.R. England*, 644 F.3d at 1043 (quoting *Goodwin v. Gen. Motors Corp.*, 275 F.3d 1005, 1013 (10th Cir. 2002)).
[430] *Metzler*, 464 F.3d at 1172.
[431] Defs.'s Mot. Summ. J. 24.
[432] Smith and Edwards Performance Evaluation Apr. 2018 at 1, ECF No. 79-8 at 2; Smith and Edwards Performance Evaluation Sept. 2018, ECF No. 79-7 at 2.
[433] Employee Warning Notice Nov. 7, 2019, ECF No. 79-5.

Woodland went back over spreadsheets in Mr. Randall's project folder "to document issues with [Mr.] Randall's work."[434] In total, she documented seven instances in which his spreadsheets had issues.[435] Defendants also point to the fact that Mr. Randall received a verbal warning in July 2018 for not completing a project on time and (for the second time) using his cell phone and personal email while at work.[436] Finally, Defendants point to Mr. Randall's low production number of written descriptions between March and June 2020.[437]

This is sufficient to meet Defendants' burden. Accordingly, Defendants' evidence satisfies their obligation to provide a legitimate, non-discriminatory reason.

### 3. There Is a Genuine Issue of Material Fact as to Whether Defendants' Nondiscriminatory Reason for Terminating Mr. Randall Was Pretextual.

At this point in the *McDonnell Douglas* framework, the burden shifts back to Plaintiffs to demonstrate that the employer's reason for terminating Mr. Randall's employment was pretextual. "[T]he relevant question is whether the reason articulated by the employer was the real reason for the challenged action."[438] "[A] plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence."[439] Such a showing requires a plaintiff to present "evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder" could find those reasons unworthy of belief.[440] "In determining whether the proffered reason for a decision

---

[434] Woodland Decl. ¶ 4, ECF No. 91-1 at 2.
[435] Defs.'s Resp. to Pls.'s First Set of Disc. Reqs. 10–12, ECF No. 79-2 at 11–13.
[436] July 17, 2018 Evaluation 1.
[437] Defs.'s Mot. Summ. J. 24–25.
[438] *Selenke*, 248 F.3d at 1261.
[439] *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1194 (10th Cir. 2016) (quoting *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007) (alteration in original).
[440] *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1209 (10th Cir. 2007) (quoting *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006)).

was pretextual, [the court] examine[s] the facts as they appear to the person making the decision."[441]

Plaintiffs argue that, "[i]n sharp contrast to the narrative that [Mr. Randall's] work performance was poor from the outset of his employment, [Ms.] Woodland's own performance reviews of [Mr. Randall] are overall positive, and show that [Mr. Randall] almost always 'fully met requirements,' and often 'exceeded requirements.'"[442]

A reasonable jury could decide either way on pretext based on Mr. Randall's performance history. While Mr. Randall's performance was volatile his first year—he received two raises but also two contemporaneously-documented warnings—he received his best performance review his second year, which documented that he met his SKU goal at least for the month before the evaluation.[443] That performance review followed months *after* Ms. Woodland recalls encouraging Mr. Randall to increase his volume of work: she remembers talking to him in January and June 2019,[444] and his performance evaluation occurred in September 2019.[445] After June 2019, there is no record evidence that Mr. Randall's volume of work was lower than Ms. Woodland desired. Between June 2019 and June 2020, Mr. Randall received a written warning about the quality of his work—he made numerous mistakes on a number of SKUs in November 2019[446]—and Ms. Woodland found he had "improperly completed" an SKU spreadsheet in February 2020.[447] But Mr. Randall was terminated for his output quantity, not quality, a characteristic of his work for which there is no record evidence that he had received warning, criticism, or feedback since a year earlier. A fact finder could determine this meant that Mr.

---

[441] *C.R. England*, 644 F.3d at 1044 (quoting *Zamora*, 478 F.3d at 1166).
[442] Pls.'s Opp'n at 40.
[443] Smith and Edwards Performance Evaluation Sept. 2019, ECF No. 79-9.
[444] Defs.'s Resp. to Pls.'s First Set of Disc. Reqs. 11–12.
[445] Smith and Edwards Performance Evaluation Sept. 2019, ECF No. 79-9.
[446] Employee Warning Notice Nov. 7, 2019, ECF No. 79-5.
[447] Defs.'s Resp. to Pls.'s First Set of Disc. Reqs. 12.

Randall was producing at the desired level because Ms. Woodland did not conduct performance evaluations when employees were "performing in their job duties."[448] The last evidence of feedback that Ms. Woodland gave to Mr. Randall about his work before his June 9, 2020 Final Warning was on April 29, 2020.[449] That day, she told Mr. Randall, "You've been doing a great job and taking care of e-mails and it looks as though you've been pretty good at writing descriptions and all that jazz. Keep up the great work . . . ."[450]

Plaintiffs next argue that the reason for termination—failure to meet production requirements—is pretextual because other employees were not treated similarly to Mr. Randall concerning their written description output.[451] The record evidence shows that each Web Store Associate had a "goal" or "benchmark" regarding the number of *product imports* (as distinct from written descriptions).[452] Ms. Woodland explained that "[s]ome [Web Store Associates] had higher output expectations because they were quicker at working, as far as creating product listings for our website. And others had lesser requirements because of the pace that—at which they worked. They weren't able to get as much done, so their requirement was less."[453] Employees who worked faster were given more work, and employees who did not work as fast were given less work.[454] The speed at which employees worked depended on "how quickly [the

---

[448] Woodland Dep. 43:11–44:6.

[449] Woodland Dep. 132:23–133:9.

[450] *Id.* at 132:23–133:9.

[451] Pls.'s Opp'n 41.

[452] Woodland Dep. 34:1–34:16; *id.* at 42:2–42:10 ("Q. And you had given Kevin a requirement that he meet 200 descriptions per month, correct? A. No. That was SKUs. Q. Okay. So only SKUs. What was his written description requirement? A. That was implemented for his last two weeks, and that requirement was ten descriptions per day. Q. So not SKUs. Ten descriptions per day. A. Correct. For the last two weeks."); Defs.'s Resp. to Pls.'s First Set of Disc. Reqs. 11–12 (describing the SKU quantity as a "goal"). As noted above, there is occasional confusion and ambiguity in the record concerning the difference between product imports and product descriptions. *See supra* note 18.

[453] Woodland Dep. 28:16–28:25. This page of the deposition was not provided to the court. However, Defendants did not object to this quotation in Plaintiff's Statement of Undisputed Facts, so it is deemed admitted for purposes of summary judgment. Pls.'s Mot. Summ. J. 14.

[454] Woodland Dep. 29:1–29:6.

associate] walks and moves through the store to collect products" and "their typing speed."[455] Each Web Store Associate's "workload varied depending on each individual," and the required minimum number of product imports "varied per individual."[456] Associates received a Smith & Edwards gift card if they hit their monthly benchmark.[457] The amount on the gift card varied depending on the extent to which they exceeded their benchmark.[458] Associates who did not met their benchmark by a significant number could receive verbal warnings to increase productivity.[459] As noted earlier, there is record evidence from which a jury could conclude that Mr. Randall often was less productive than other employees or than his employer desired.

When Mr. Randall was hired, there was not a required minimum number of written descriptions.[460] Ms. Woodland "implemented [the minimum number requirement] with [Mr. Randall] later on"[461]—during the last two weeks of his employment.[462] She never implemented the benchmark with any of the other associates.[463] Looking at Mr. Randall's record, he averaged 52 written descriptions per month.[464] In his last two weeks, Ms. Woodland set a requirement of 10 per day, or 50 per week, 200 per month—which amounts to four times the number Mr. Randall averaged prior to that.[465] He was terminated for not reaching the 10 description per day requirement, a requirement that was not in Mr. Randall's job description, did not exist before June 2020, and was never implemented for any other associate. Finally, his probationary period

---

[455] *Id.* at 32:15–32:21.
[456] *Id.* at 33:4–33:11.
[457] Hedin Dep. 20:21–21:26.
[458] *Id.* at 20:21–21:2.
[459] Woodland Dep. 163:5–163:15 (discussing an employee whose benchmark is 300 but who currently achieves 200 to 250).
[460] *Id.* at 37:7–37:10.
[461] *Id.* at 37:9–37:10.
[462] *Id.* at 42:6–42:8.
[463] *Id.* at 37:11–37:15, 38:4–38:7 ("Q. Was there any other web store associate who had a requirement to meet a certain number of product descriptions? A. Not of descriptions, no.").
[464] *Id.* at 40:6–40:12.
[465] *Id.* at 42:7–42:8.

was two weeks when the Smith and Edwards Employee Policy Manual appears to describe a 90-day probationary period for such an offense.[466] This is evidence from which a jury could find Defendants' "proffered legitimate reasons for [their] action . . . [as] unworthy of belief."[467] Of course, the fact finder also could conclude that the written description requirement was needed for Mr. Randall because his productivity was generally low, with record evidence supporting the view that this was a feature of his work performance stretching back over a significant period of time.

For all of the foregoing reasons, a reasonable jury could decide this issue either way. Accordingly, summary judgment on the ADA disability discrimination claim is denied.

### B.   There Is a Genuine Issue of Material Fact as to Whether Defendants Failed to Provide Mr. Randall Reasonable Accommodation.

"The ADA defines the phrase 'discriminate against a qualified individual on the basis of disability' to include 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer.'"[468] "[A] failure to accommodate claim is evaluated under a modified *McDonnell Douglas* burden-shifting framework."[469] This is because the claim "does not require that an employer's action be motivated by a discriminatory animus directed at the disability."[470] "Rather, any failure to provide reasonable accommodations for a disability is necessarily 'because of a disability'—the accommodations are only deemed reasonable (and, thus, required) if they are needed because of the disability—and no proof of a particularized discriminatory

---

[466] Employee Policy Manual 19–20.
[467] *Proctor*, 502 F.3d at 1209 (quoting *Argo*, 452 F.3d at 1203).
[468] *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1204 (10th Cir. 2018) (quoting *Punt*, 862 F.3d at 1048).
[469] *Id.*
[470] *Punt*, 862 F.3d at 1048.

animus is exigible."[471] Under the first step of the modified framework, a plaintiff must demonstrate that "1) she was disabled, 2) she was otherwise qualified, 3) she requested a plausibly reasonable accommodation, and 4) the [employer] refused to accommodate her disability."[472] "Meeting this test 'is not onerous.'"[473]

"If a plaintiff establishes a prima facie claim, the burden shifts to the defendant to present evidence either 'conclusively rebutting one or more elements of plaintiff's prima facie case' or 'establishing an affirmative defense.'"[474] "If the employer satisfies either, the employer is entitled to summary judgment unless the employee presents evidence establishing a genuine dispute about the affirmative defenses or rehabilitates any challenged elements of her prima facie case sufficiently to establish at least a genuine dispute of material fact."[475]

The court has already discussed whether Mr. Randall had a disability for purposes of the ADA and whether Mr. Randall was qualified. The parties further dispute (1) whether Mr. Randall requested an accommodation, (2) whether any such request was reasonable, (3) whether Defendants engaged in the interactive process, and (4) whether Defendants refused to accommodate Mr. Randall's purported disability.

> 1. *Plaintiff Established a Prima Facie Case of Failure to Provide Reasonable Accommodation.*
>
>> a. There Is Record Evidence that Mr. Randall Made a Request for Accommodation.

"[B]efore an employer's duty to provide reasonable accommodations . . . is triggered under the ADA, the employee must make an adequate request, thereby putting the employer on

---

[471] *Id.* (quoting *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir. 1999)).
[472] *Aubrey v. Koppes*, 975 F.3d 995, 1005 (10th Cir. 2020) (citing *Lincoln*, 900 F.3d at 1204).
[473] *Dansie v. Union Pac. R.R. Co.*, 42 F.4th 1184, 1192 (10th Cir. 2022) (quoting *Aubrey* , 975 F.3d at 1005).
[474] *Id.* at 1193 (quoting *Aubrey*, 975 F.3d at 1005).
[475] *Id.*

notice."[476] "Although the notice or request 'does not have to be in writing, be made by the employee, or formally invoke the magic words 'reasonable accommodation,'' it 'nonetheless must make clear that the employee wants assistance for his or her disability.'"[477]

Defendants argue that Mr. Randall "made no request for an accommodation."[478] They argue that Dr. Gilroy's FMLA Certification, which Mr. Randall gave to Mr. Peek, "indicates that Mr. Randall did not need an accommodation because it stated that the medical condition did not make him unable to perform any of his job functions."[479] Further, they contend the Certification and Mr. Randall "failed to specify when he would need that time off," so Mr. Randall did not make an adequate request for accommodation.[480]

The record evidence shows that Mr. Randall informed Mr. Peek and Ms. Woodland about his ESLD diagnosis,[481] that he received FMLA paperwork from Smith & Edwards,[482] that Dr. Gilroy filled out the FMLA Certification,[483] that Mr. Randall returned it to Mr. Peek,[484] and that Mr. Peek and Ms. Woodland understood that Mr. Randall would be taking leave *when he received a liver transplant offer*.[485] Defendants' assertion that this is not a request for accommodation because it is not specific enough is patently untenable given the unpredictable nature of organ transplants. Defendants understood that Mr. Randall had liver disease, he needed a liver transplant surgery, and his surgery was dependent on receiving a liver offer. Mr. Randall

---

[476] *C.R. England*, 644 F.3d at 1049 (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999)).
[477] *C.R. England*, 644 F.3d at 1049.
[478] Defs.'s Opp'n 26.
[479] *Id.*
[480] *Id.*
[481] Peek Dep. 49:6–49:11; Defs.'s Resp. to Pls.'s First Set of Disc. Reqs. 8, ECF No. 79-2 at 9.
[482] Defs.'s Resp. to Pls.'s First Set of Disc. Reqs. 8, ECF No. 79-2 at 9.
[483] Certification 1.
[484] Peek Dep. 61:19–61:21.
[485] *Id.* at 55:13–55:22; Woodland Dep. 115:9–115:21.

repeatedly communicated with Ms. Woodland about his status on the transplant list.[486] This was

a request for a reasonable accommodation.

If it credits Mrs. Randall's testimony, a reasonable jury also could find that Mr. Randall

requested "[h]is hours to be lowered and his workload to be lowered."[487] The request was due to

his "diminished ability to work" because he was "forgetful and confused at times"[488] and

because he had "a lot of doctors' appointments that he had to leave for," making it difficult to

complete his workload because "he was gone a lot for doctors' appointments."[489] If the fact

finder credits this testimony, it would be a clear request for assistance with his ESLD, and

therefore a request for a reasonable accommodation.

Finally, there is record evidence that Mr. Randall requested flexibility to attend doctors'

appointments.[490] Neither party contests that this was a request for a reasonable accommodation

or that it was granted.

> b.  A Jury Could Find that Mr. Randall Requested a Plausibly Reasonable
>     Accommodation.

"The determination of whether a requested accommodation is reasonable 'must be made

on the facts of each case taking into consideration the particular individual's disability and

employment position.'"[491] "'Reasonable accommodation' means 'those accommodations which

presently, or in the near future, enable the employee to perform the essential functions of his

job.'"[492] "The ADA defines 'reasonable accommodation' to 'include . . . job restructuring, part-

time or modified work schedules, reassignment to a vacant position, acquisition or modification

---

[486] Woodland Dep. 127:10–127:19, 131:19–132:11, 132:23–133:9, 135:12–135:14, 138:21–139:5.
[487] Randall Dep. 113:15–113:20.
[488] *Id.* at 113:15–113:24.
[489] *Id.* at 114:1–114:5.
[490] Peek Dep. 51:5–51:8.
[491] *Punt*, 862 F.3d at 1050–51 (quoting *Mason*, 357 F.3d at 1123–24).
[492] *Dansie*, 42 F.4th at 1193 (quoting *Aubrey*, 975 F.3d at 1007).

of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, ... and other similar accommodations for individuals with disabilities.'"[493]

To begin, there is a genuine issue of material fact concerning whether Mr. Randall needed any accommodation *before he was terminated*. As discussed earlier, there is evidence from which a reasonable jury could conclude that Mr. Randall was performing all the essential functions of his job up until his termination. If Mr. Randall was "qualified" without accommodation, then Plaintiffs' failure to accommodate claim on that basis fails. But because a reasonable jury could find that Mr. Randall was qualified with accommodation (decreased hours and thereby reduced workload) before his planned leave for surgery, the court considers Mr. Randall's two requests that could have been implemented before his surgery.

As noted earlier, Mrs. Randall has testified that she overheard Mr. Randall requesting that his hours and workload be decreased.[494] The evidence shows that Mr. Randall, who received an $11.50 hourly wage,[495] was not performing "time sensitive" projects.[496] This means that Mr. Randall's requested accommodation—decreased hours—would not necessarily result in "shift[ing] h[is] work onto other employees."[497]  If the fact finder credits Mrs. Randall's testimony as to Mr. Randall's requests, it could conclude that this was a plausibly reasonable request.

"It is well-settled that a request for leave may lead to a 'reasonable' accommodation—such a request may allow an employee sufficient time to recover from an injury or illness such

---

[493] *Lincoln*, 900 F.3d at 1204–05 (quoting 42 U.S.C. § 12111(9)).
[494] Randall Dep. 113:18–113:20.
[495] Defs.'s Resp. to Pls.'s First Set of Disc. Reqs. 13.
[496] Woodland Dep. 80:17–80:20. Ms. Woodland did not assign time sensitive projects to Mr. Randall after July 2018, when he failed to complete a project by an assigned deadline. July 17, 2018 Evaluation 1.
[497] *Whitmeyer v. R & O Const., Inc.*, 2013 WL 5745481, at *3 (D. Utah 2013).

that the employee can perform the essential functions of the job . . . in the future."[498] "There are two limits on the bounds of reasonableness for a leave of absence. The first limit is clear: The employee must provide the employer an estimated date when *she can resume* her essential duties."[499] "The second is durational. A leave request must assure an employer that an employee can perform the essential functions of her position in the 'near future.'"[500] "Whether an accommodation is reasonable under the ADA is a mixed question of law and fact."[501]

Mr. Randall requested 12 weeks of FMLA leave.[502] Defendants understood that Mr. Randall's need for leave would end after his transplant surgery.[503] They knew that he was on the transplant list as of March 2020,[504] that he was third on the list as of April, and that a call could come any day.[505] While no one, including Defendants, knew when Mr. Randall's surgery would be, there is enough evidence for the inference that they knew it would be sometime in the near future; it was not an "indefinite period of time."[506] They also had reason to believe that Mr. Randall would return to work within, at most, 12 weeks of his surgery,[507] although there also is record evidence that Ms. Woodland believed he would return even sooner (within 10 days).[508]

---

[498] *Punt*, 862 F.3d at 1051 (quoting *Cisneros v. Wilson*, 226 F.3d 1113, 1129 (10th Cir. 2000)); *Hudson v. MCI Telecommc'ns Corp.*, 87 F.3d 1167, 1169 (10th Cir.1996) ("This court agrees with plaintiff that a reasonable allowance of time for medical care and treatment may, in appropriate circumstances, constitute a reasonable accommodation."); *see* 29 C.F.R. § 825.702 (a)–(b) ("Thus, the leave provisions of the [FMLA] are wholly distinct from the reasonable accommodation obligations of employers covered under the [ADA] . . . . When an employer violates both FMLA and a discrimination law, an employee may be able to recover under either or both statutes . . . . FMLA entitles eligible employees to 12 weeks of leave in any 12–month period due to their own serious health condition, whereas the ADA allows an indeterminate amount of leave, barring undue hardship, as a reasonable accommodation.").

[499] *Robert v. Bd. of Cnty. Comm'rs of Brown Cnty., Kans.*, 691 F.3d 1211, 1218 (10th Cir. 2012) (citing *Cisneros*, 226 F.3d at 1129) (emphasis added).

[500] *Id.* (citing *Cisneros*, 226 F.3d at 1130).

[501] *Punt*, 862 F.3d at 1050–51 (quoting *Mason*, 357 F.3d at 1122).

[502] Certification 3.

[503] Woodland Dep. 132:1–132:15.

[504] *Id.* at 130:8–130:13.

[505] *Id.* at 127:12–127:19.

[506] Defs.'s Opp'n 28 (quoting *Whitmeyer*, 2013 WL 5745481, at *3).

[507] Peek Dep. 55:20–55:22.

[508] Woodland Dep. 127:20–128:25.

This evidence could allow a reasonable jury to conclude that Mr. Randall's request was within the limits on the bounds of reasonableness for a leave of absence in the context of an organ transplant: there was an expected end time frame and Smith & Edwards had reason to believe that Mr. Randall would be able to perform the essential functions of his job in the near future.

> c. There Is a Genuine Dispute of Material Fact as to Whether Defendants Engaged in an Interactive Process with Mr. Randall.

Plaintiffs argue that Defendants failed to engage in the interactive process required by the ADA.[509] Plaintiffs contend that "Defendants never attempted to identify [Mr. Randall's] precise limitations or discuss his reasonable accommodations in depth—even when [Mr. Randall] brought up his limitations to [Ms.] Woodland."[510] Plaintiffs point out that Mr. Peek never talked to Mr. Randall about the ADA after learning Mr. Randall had liver failure and contend that Mr. Peek never connected with Mr. Randall about Dr. Gilroy's statements in the FMLA Certification about Mr. Randall's potential for flare-ups, need for reduced work hours, and time off for treatment and transplant surgery.[511] They argue that Defendants "merely asking [Mr. Randall] about his medical appointments and about his placement on the transplant list does not meet this burden."[512]

Defendants reply that Mr. Randall talked to Mr. Peek and Ms. Woodland "about his need to take time off for doctors' appointments before his transplant procedure," and they told "him to take time off if he needed it."[513] They point out that Mr. Randall "would [] frequently talk with [Ms.] Woodland about his doctors' appointments, medical leave, and medical treatment and

---

[509] Pls.'s Mot. Summ. J. 58.
[510] Pls.'s Reply 35.
[511] Pls.'s Mot. Summ. J. 59–60; see Peek Dep. 48:19–48:24, 65:20–66:1.
[512] Pls.'s Reply 35.
[513] Defs.' Opp'n 30.

inform [Ms.] Woodland when he was taking time off for his doctors' appointments, which she approved."[514] This, Defendants argue, satisfied their duty to engage in the interactive process.[515]

"To facilitate the reasonable accommodation, '[t]he federal regulations implementing the ADA envision an interactive process that requires participation by both parties.'"[516] "The obligation to participate in this interactive process is inherent in the statutory requirement that the employer offer a disabled, but otherwise qualified employee a reasonable accommodation."[517] "[T]he interactive process must ordinarily begin with the employee providing notice to the employer of the employee's disability and any resulting limitations."[518] This triggers the employer's duty "to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."[519]  "The interactive process requires the good faith participation of both the employer and the employee."[520]

Here, there is record evidence that Mr. Randall gave Mr. Peek his FMLA Certification.[521] That Certification described limitations associated with Mr. Randall's ESLD: unavailability due to possible evaluation and treatment prior to his liver transplant, routine lab and diagnostic testing, the need for follow-up treatment or a reduced schedule, and episodic flare-ups that would prevent Mr. Randall from performing his job, as well as the possibility of additional limitations

---

[514] *Id.*
[515] *Id.* at 31.
[516] *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1315 (10th Cir. 2017) (quoting *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 916 (10th Cir. 2004))
[517] *Aubrey*, 975 F.3d at 1007 (citing *Smith v. Midland Brake, Inc., a Div. of Echlin, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999)).
[518] *Bartee*, 374 F.3d at 916 (quoting *Midland Brake*, 180 F.3d at 1171).
[519] *Midland Brake*, 180 F.3d at 1171 (quoting 29 C.F.R. § 1630.2(o)(3)); *Aubrey*, 975 F.3d at 1007.
[520] *Aubrey*, 975 F.3d at 1007.
[521] Peek Dep. 72:22–73:10.

due to the disease's progression and Mr. Randall's health's possible further decline.[522] Mr. Randall asked for the ability "to go to doctors' appointments."[523] From this evidence, a reasonable fact finder could determine that Mr. Randall initiated the interactive process.

Next, there also is record evidence that would permit the conclusion that Defendants engaged in the interactive process: Defendants offered for Mr. Randall to work at home,[524] for Mr. Randall to take time off for his doctors' appointments,[525] and for Mr. Randall to have modified work duties due to him not being physically present in the office (such as not taking product dimension measurements).[526] A jury could find these interactions, and the ongoing dialogue about how Mr. Randall was doing, sufficient.

But there is also evidence from which the jury could find that Defendants did not in good faith attempt to identify Mr. Randall's precise limitations after he informed them he had ESLD and needed a transplant. The record is unclear about the degree to which Smith & Edwards sought to understand Mr. Randall's limitations. There also is no identified record evidence that Defendants discussed any requests for fewer hours[527] other than that Ms. Woodland informed Mr. Randall that he had to work at least 30 hours per week to maintain his health insurance benefit.[528] From this evidence, a jury could find that Defendants "made no effort to discover exactly what [Mr. Randall]'s limitations were at that time, nor in exploring with [Mr. Randall] whether there were any accommodations that would have enable h[im] to [continue] to work at that time, or in the near future, even with h[is] limitations."[529]

---

[522] Certification 2–3.
[523] Peek Dep. 51:5–51:8.
[524] Work from Home Email, ECF No 79-12.
[525] Woodland Dep. 108:7–108:14, 133:17–134:1.
[526] *Id.* at 166:11–166:15.
[527] As noted earlier, whether such requests were made is a genuinely disputed fact.
[528] *Id.* at 126:5–126:13.
[529] *Aubrey*, 975 F.3d at 1008.

          d.   There Is Evidence that at least One of Mr. Randall's Requests for a
               Plausibly Reasonable Accommodation Was Denied.

The final element of Plaintiffs' prima facie case requires that Plaintiffs put on evidence that, if credited, demonstrate that Mr. Randall's request for a plausibly reasonable accommodation was denied. Plaintiffs have done so. First, while there is a factual dispute as to whether Mr. Randall made a request to work fewer hours, there is evidence from which the fact finder could infer that any such request was denied: Mr. Peek and Ms. Woodland both testified that Mr. Randall did not work less hours while he was waiting on a transplant.[530] Second, a reasonable jury could find that Mr. Randall's request for leave post-transplant surgery, while nominally granted,[531] was effectively denied because Mr. Randall was fired before he could take that leave.[532] While there is a factual dispute as to whether Defendants granted Mr. Randall his request for a reduced workload,[533] the evidence of the two denials is sufficient for Plaintiffs' prima facie case.

       2.   *There Is a Genuine Dispute of Material Fact as to Whether Defendants*
            *Reasonably Accommodated Mr. Randall.*

Because Plaintiffs have established "a prima facie claim, the burden shifts to [Defendants] to present evidence either 'conclusively rebutting one or more elements of plaintiff's prima facie case' or 'establishing an affirmative defense.'"[534]

---

[530] Woodland Dep. 141:18–142:1; Peek Dep. 73:14–73:16.

[531] Designation Notice (Family and Medical Leave Act) 1.

[532] Woodland Dep. 151:19–152:20; Peek Dep. 83:24–84:14 (testifying as to his notes regarding a call after Mr. Randall was fired in which Mr. Peek told Mr. Randall that Mr. Randall had never taken any leave and that Mr. Randall had told Ms. Woodland that he was going to take his FMLA leave after his surgery).

[533] Woodland Dep. 142:2–142:7 ("Q. . . . [D]id his workload decrease in any way? A. Yes, because there wasn't the additional office duties assigned to him while he was working from home. There were no phone calls that he was expected to answer. No running around working with the shipping department. Q. . . . Is there anything else that he wasn't doing in June 2020 that he would normally have done in the office? A. He wasn't printing Amazon orders anymore."); Peek Dep. 85:13–85:21 (testifying that during Mr. Randall's two-week probationary period, he had "nothing else to do but" product descriptions, so it was a reduction in his workload).

[534] *Dansie*, 42 F.4th at 1193 (quoting *Aubrey*, 975 F.3d at 1005).

Defendants contend that they accommodated Mr. Randall by reducing his workload from "twelve-and-a-half descriptions a day down to ten a day"[535] and they decreased the number of hours that Mr. Randall needed to work.[536] Further, "[b]y the end of his employment, Smith and Edwards completely eliminated an essential job function of processing Amazon orders and reduced his quota or product descriptions to just ten product descriptions per week."[537]

Defendants cite to Mrs. Randall's deposition for these contentions, even while having argued that her statements on these issues are "inadmissible hearsay . . . and are not based on personal knowledge."[538] Mrs. Randall's statements on these issues are inadmissible because they are based on statements that Mr. Randall purportedly made to her, are offered for the truth of the matter asserted, and do not qualify for an exception or exemption. Concerning Defendants' last argument—that they "completely eliminated an essential job function of processing Amazon orders and reduced his quota of product descriptions to just ten product descriptions per week"—Defendants cite no support for this statement in the record. To the contrary, Ms. Woodland's notes on Mr. Randall's Final Warning state that Mr. Randall was required to "also check[] emails + approv[e] Amazon Return Requests" over his final two weeks.[539] And the ten product descriptions requirement was per day,[540] not per week, a massive increase over Mr. Randall's average (52 per month).[541] There is no quota to compare it to because there was never a requirement set on written descriptions before June 9, 2020.[542] Finally, the record evidence is

---

[535] Defs.'s Opp'n 28 (citing Randall Dep. 114:21–114:24).
[536] Id. (citing Randall Dep. 116:6–116:17).
[537] Id.
[538] Defs.'s Opp'n 11.
[539] Employee Warning Notice June 9, 2020, ECF No. 79-6 at 2.
[540] Woodland Dep. 42:7–42:8.
[541] Id. at 40:6–40:12.
[542] Id. at 37:7–37:10, 38:4–38:7, 42:6–42:8.

that Mr. Randall was no longer required to print Amazon orders,[543] but, as noted above, he was still required to process return requests.[544]

Nevertheless, there is some record evidence that Defendants provided accommodations to Mr. Randall. For example, the record shows that Smith & Edwards offered for Mr. Randall to work from home because of his susceptibility to COVID-19 due to his liver condition,[545] that some of his responsibilities were eliminated due to him working from home (handling customer service phone calls, "running around working with the shipping department," taking product dimensions, and printing Amazon orders),[546] and that Mr. Randall was granted permission to take time off for doctors' appointments.[547] While this evidence does not "*conclusively* rebut[] one or more elements of plaintiff's prima facie case' or 'establish[] an affirmative defense,'"[548] it does create an issue of material fact concerning whether these were reasonable accommodations.

In conclusion, there is a genuine issue of material fact as to whether Mr. Randall required a reasonable accommodation to perform the essential functions of his job, whether Defendants engaged in the interactive process, and whether Defendants denied Mr. Randall reasonable accommodation. Neither side is entitled to summary judgment.

## V.   There Are Genuine Issues of Material Fact that Preclude Summary Judgment on Plaintiffs' Claims under the Family and Medical Leave Act.

The FMLA seeks to address the issue of "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods" by "entitl[ing] employees to take reasonable leave for medical reasons."[549] Specifically, it provides

---

[543] *Id.* at 51:18–51:20.
[544] Employee Warning Notice June 9, 2020 (noting Mr. Randall was required to "also check[] emails + approv[e] Amazon Return Requests"); Woodland Dep. 66:6–66:11.
[545] Woodland Dep. 120:5–120:24.
[546] *Id.* at 142:3–142:7, 166:9–166:18.
[547] Peek Dep. 84:4–84:5.
[548] *Dansie*, 42 F.4th at 1192 (quoting *Aubrey*, 975 F.3d at 1005) (emphasis added).
[549] 29 U.S.C. § 2601(a)(4), (b)(2).

that an "eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."[550] Leave for this reason "may be taken intermittently or on a reduced leave schedule when medically necessary."[551]

The statute makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA.[552] A violation of this provision is referred to as an "interference" claim. The statute also provides for a retaliation claim by making it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA.[553] Plaintiffs bring both an interference claim and a retaliation claim under the FMLA.

### A. There Are Genuine Issues of Material Fact that Preclude Summary Judgment on Plaintiffs' FMLA Interference Claim.

"To prevail on an FMLA interference claim, the employee must show that she was entitled to FMLA leave, that some adverse action by the employer interfered with her right to take that leave, and 'that the employer's action was related to the exercise or attempted exercise of [her] FMLA rights.'"[554] "An employer can defend against the claim, however, by showing that the employee would have been terminated . . . regardless of the request for FMLA leave."[555]

---

[550] *Id.* at § 2612(1)(D).

[551] *Id.* at § 2612(b)(1).

[552] *Id.* at § 2615(a)(1).

[553] *Id.* at § 2615(a)(2); *see Howard v. Garage Door Grp., Inc.*, 136 F. App'x 108, 113 (10th Cir. 2005) (quoting *Tate*, 268 F.3d at 997 n. 11); *Branham v. Delta Airlines*, 678 F. App'x 702, 705 (10th Cir. 2017) ("The FMLA makes it unlawful for an employer to interfere, restrain, or deny the exercise or attempt to exercise any right provided under the FMLA." (quoting *Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1226 (10th Cir. 2012))).

[554] *Branham*, 678 F. App'x at 705 (quoting *Metzler*, 464 F.3d at 1180); *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 961 (10th Cir. 2002) ("A plaintiff can prevail under an entitlement theory if she was denied her substantive rights under the FMLA for a reason connected with her FMLA leave.").

[555] *Branham*, 678 F. App'x at 705 (quoting *ScriptPro, LLC*, 700 F.3d at 1227).

1.  *Record Evidence Supports a Finding that Mr. Randall Was Entitled to FMLA Leave.*

It is undisputed that Mr. Randall was qualified for FMLA leave and that Smith & Edwards is a covered employer under the FMLA.[556] However, Defendants assert that Mr. Randall was not exercising his rights under FMLA because (1) he did not provide Smith & Edwards with specific dates for his leave in the FMLA Certification and (2) he did not specify that when he would clock out for doctors' appointments for his ESLD treatment that he was taking intermittent leave.[557]

"[L]eave is qualifying 'if (1) it is the result of a 'serious health condition' that (2) 'makes the employee unable to perform the functions' of [his] job.'"[558] The FMLA "does not require a covered employee to specifically ask for FMLA benefits. An employee need not expressly assert rights under the FMLA or even mention the FMLA."[559] "The critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition."[560] "It is the employer's responsibility to designate leave as FMLA-qualifying, . . . but the employee must explain the reasons for the needed leave and 'state a qualifying reason for the needed leave.'"[561]

In *Crowell v. Denver Health and Hospital Authority*, the Tenth Circuit considered whether an employee was entitled to FMLA leave.[562] There, the plaintiff-employee requested leave for a shoulder surgery.[563] On the FMLA medical certification form, her physician marked

---

[556] *See* Peek Dep. 54:12–54:16, 33:2–33:4.
[557] Defs.'s Opp'n 21.
[558] *Crowell v. Denver Health & Hosp. Auth.*, 572 F. App'x 650, 654 (10th Cir. 2014) (quoting *Stoops v. One Call Commc'ns, Inc.*, 141 F.3d 309, 313 (7th Cir. 1998)).
[559] *Tate*, 268 F.3d at 997 (citing 29 C.F.R. §§ 825.302(c), 825.303(b)).
[560] *Crowell*, 572 F. App'x at 653 (quoting *Satterfield v. Wal–Mart Stores, Inc.*, 135 F.3d 973, 977 (5th Cir. 1998)).
[561] *Id.* (citing 29 C.F.R. § 825.301(a)–(b)).
[562] *Id.* at 654.
[563] *Id.* at 651.

the box for "continuous leave" but also answered "yes" to the question concerning whether the condition would cause episodic flare-ups periodically preventing the employee from performing her job functions.[564] The employer interpreted this as a request for continuous rather than intermittent leave.[565] The employee then took time off work to go to the emergency room for chest pain and argued that she was entitled to FMLA leave for that visit, but the employer denied it.[566] The employer asserted that the emergency room visit was not related to the chronic shoulder condition for which the plaintiff was eligible for FMLA.[567] The court agreed, finding that there was an absence of evidence supporting the employee's position that the FMLA leave for which she was qualified covered the emergency room visit.[568]

The record evidence shows that Mr. Randall notified Mr. Peek and Ms. Woodland of his serious health condition in October 2019,[569] that Mr. Peek gave him FMLA paperwork, that Mr. Randall's doctor filled out the paperwork in March 2020,[570] and that Mr. Randall communicated with Ms. Woodland about his doctors' appointments and urgent care visits related to his serious health condition,[571] as well as with Mr. Peek about his plan to take time off following his transplant surgery.[572] This is enough to show that Mr. Randall was entitled to FMLA leave for his doctors' appointments leading up to his surgery, his urgent care visits related to his ESLD, and for recovery from his transplant surgery: he had a serious health condition and the leave was

---

[564] *Id.* at 655.
[565] *Id.* After the fact, the plaintiff told her employer the certification was for intermittent leave. In other words, after taking time off to go to the emergency room for chest pain on June 5, she learned that she had been approved for continuous leave for her shoulder condition. *Id.* At that point, she told her employer she needed intermittent leave instead. *Id.* The employer called plaintiff's doctor, who did not verify this. *Id.*
[566] *Id.* at 651.
[567] *Id.* at 657.
[568] *Id.*
[569] Defs.'s Resp. to Pls.'s First Set of Disc. Reqs. 8.
[570] *Id.*; Certification; Peek Dep. 61:19–61:21.
[571] Woodland Dep. 108:7–108:11, 129:1–129:13, 133:21–134:9, 145:3–145:5, 150:15–151:8.
[572] Woodland Dep. 127:20–128:25; Peek Dep. 55:17–55:22.

the result of that condition. While there is the same discrepancy on Mr. Randall's Certification

form (as was the case in *Crowell*), there is no dispute that Mr. Randall's treating physicians

believed he would need time off for doctors' appointments and flare ups before the transplant[573]

and that the time off Mr. Randall took was related to his serious health condition. Further, the

fact that a date was not provided on the form is immaterial here; Mr. Randall reasonably

communicated with his employer about his need for leave, the reason for his need, and gave

Smith & Edwards sufficient notice. Therefore, he was entitled to FMLA leave for his ESLD, and

the doctors' appointments, medical visits, and planned transplant surgery were FMLA-qualifying

leave.

### 2. Defendants Took an Adverse Action that Prevented Mr. Randall from Taking FMLA Leave.

"In order to satisfy the second element of an interference claim, the employee must show

that she was prevented from taking the full 12 weeks' of leave guaranteed by the FMLA, denied

reinstatement following leave, or denied initial permission to take leave."[574] This element is

satisfied by Plaintiffs' showing that Mr. Randall was prevented from taking his full 12 weeks' of

FMLA leave because he was terminated.

### 3. There Is a Genuine Issue of Material Fact as to Whether Mr. Randall's Termination Was Related to his FMLA Leave.

"If an employer interferes with the FMLA-created right to medical leave . . . a

deprivation of this right is a violation regardless of the employer's intent."[575] "[T]iming can be

particularly suggestive in determining whether termination relates to the exercise of FMLA

---

[573] *See* Gilroy Dep. 28:2–33:21.
[574] *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007) (citing *Metzler*, 464 F.3d at 1181; 29 C.F.R. § 825.216(a)(1)).
[575] *Diffee Ford-Lincoln-Mercury*, 298 F.3d at 960 (citing *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999)).

rights."[576] However, "an employee may be dismissed, preventing her from exercising her statutory right to FMLA leave . . . if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave."[577] "For an employer to demonstrate that it would have terminated the employee anyway, it must provide evidence of alternative reasons for termination."[578] "[S]ummary judgment for the employer is warranted only when there is no genuine dispute as to any material fact regarding the grounds for termination."[579] This most commonly occurs when the employer can demonstrate that the employee clearly violated a consistently-enforced company policy.[580]

In *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, the Tenth Circuit held that the plaintiff had sufficient evidence for an interference claim under the FMLA.[581] There, the plaintiff requested FMLA leave for her own serious health condition.[582] Her supervisor had been asking her to begin a warranty claims training for junior employees for the last three or four years, but no deadline had ever been set.[583] She did not complete the training, and was formally reprimanded four months before her diagnosis of cancer.[584] After she was diagnosed, she requested leave.[585] There was no formal deadline for completing the training for any of the other

---

[576] *ScriptPro, LLC*, 700 F.3d at 1227.

[577] *Metzler*, 464 F.3d at 1180 (citing *Diffee Ford-Lincoln-Mercury*, 298 F.3d at 961).

[578] *ScriptPro, LLC*, 700 F.3d at 1227 (citing *Metzler*, 464 F.3d at 1180).

[579] *Id.* (citing *DeFreitas v. Horizon Inv. Mgmt. Corp.*, 577 F.3d 1151, 1161 (10th Cir. 2009)).

[580] *See Vanmeveren v. Whirlpool Corp.*, 65 F. App'x 698, 700 (10th Cir. 2003) (finding alternative reasons for termination when "plaintiff incurred her seventh unexcused partial absence . . . for which she was subject to automatic termination" and where it was "undisputed that Whirlpool strictly and consistently enforces this policy"); *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869 (10th Cir. 2004) (finding alternative reasons for termination when uncontroverted evidence that the employer fired the plaintiff for violating the company's absence policy without notifying her supervisor of her absences, especially when the supervisor did not know about her FMLA leave request); *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1009 (10th Cir. 2011) (finding alternative reasons for termination when plaintiff failed to give proper notice of her absences three days in a row).

[581] *Diffee Ford-Lincoln-Mercury*, 298 F.3d at 961.

[582] *Id.* at 959, 961.

[583] *Id.* at 958.

[584] *Id.* at 958.

[585] *Id.* at 959.

employees, but her supervisor told her she had to complete the training before she took leave.[586] She did not, and she was terminated while she was on leave.[587] Considering that the evidence showed there was no formal emphasis on the importance of training, there was a lack of monitoring or reporting of training progress, and the temporal proximity of the FMLA leave and her dismissal, the court held that "the jury could reasonably infer that, had [the plaintiff] been healthy, [the employer] would have permitted her to continue indefinitely at her job without training anyone."[588] Accordingly, the employer was not entitled to summary judgment.[589]

However, "the FMLA does not protect an employee from performance problems caused by the condition for which FMLA leave is taken, nor does it require that an employee be given an opportunity to show improved job performance when not ill."[590] In *McBride v. CITGO Petroleum Corp.*, the Tenth Circuit found that an employee was terminated for performance issues rather than for exercising her right to FMLA leave.[591] There, the plaintiff-employee was diagnosed with severe depression during her fourteenth year as an employee of CITGO.[592] Within a year of her diagnosis, over a two-month period, her supervisor met with her four times regarding deficiencies in her work performance.[593] She was given a letter that warned that failure to improve could result in termination.[594] Her depression became totally debilitating the same month she received that letter, and she requested FMLA leave shortly thereafter.[595] While she was on leave, her supervisor discovered several problems with her prior work—a number of

---

[586] *Id.* at 961.
[587] *Id.* at 959.
[588] *Id.* at 961.
[589] *Id.*
[590] *McBride v. CITGO Petroleum Corp.*, 281 F.3d 1099, 1108 (10th Cir. 2002).
[591] *Id.*
[592] *Id.* at 1102.
[593] *Id.*
[594] *Id.*
[595] *Id.*

unprocessed invoices that dated back several months and had not been timely paid and improper payments to a vendor.[596] When she returned from leave, she was asked for an explanation but she failed to give a satisfactory answer.[597] CITGO then terminated her employment.[598] Even though her performance problems may have been a result of her illness, this did not establish the connection between her use of FMLA and her termination.[599] Because the plaintiff was not terminated for reasons related to the request or for the taking of FMLA leave, summary judgment for the employer was proper.[600]

Here, a reasonable jury could find that Mr. Randall's employment termination was related to his request for FMLA leave. In March 2020, Mr. Randall received FMLA paperwork and returned it to Mr. Peek.[601] At that point, Mr. Peek and Ms. Woodland knew Mr. Randall would be taking 12 weeks of leave.[602] As noted earlier, from March through June 2020, Smith & Edwards experienced a 65 to 75 percent increase in online orders, creating more work for Web Store Associates.[603] Ms. Woodland knew Mr. Randall could have transplant surgery soon.[604] Because she understood that he was taking FMLA leave to recover from the surgery,[605] she knew she would be without one of her two staff members for months, during a period when the web store was exceptionally busy.[606] Then, knowing Mr. Randall was waiting for a call with a liver offer and could begin a continuous, multi-month leave at any moment, Ms. Woodland and Mr.

---

[596] *Id.*
[597] *Id.* at 1103.
[598] *Id.*
[599] *Id.* at 1108.
[600] *Id.*
[601] Peek Dep. 58:19–61:21.
[602] Certification 3.
[603] Woodland Dep. 45:9–45:24; *id.* at 46:4–46:7.
[604] *Id.* at 127:10–127:24.
[605] *Id.* at 127:20–127:24.
[606] *Id.* at 45:9–45:24.

Peek imposed a new requirement for Mr. Randall (a certain number of written descriptions),[607] a requirement set at nearly quadruple his prior output.[608] Finally, on the same day that Mr. Randall received his first liver offer, Smith & Edwards terminated Mr. Randall's employment based on his failure to meet the written description number requirement.[609]

On the other hand, there is also record evidence that would permit a reasonable jury to find that Smith & Edwards' decision to terminate Mr. Randall's employment was, as in *McBride*, due to Mr. Randall's ongoing performance issues, which were perhaps due in part or full to his medical condition but unrelated to his FMLA leave. There is a trail of documentation throughout Mr. Randall's employment of his performance issues: in April 2018, he was warned about social media use at work,[610] in July 2018, he was warned about his failure to meet a deadline and his ongoing use of his cell phone at work,[611] in November 2019 he was given a final warning for substandard work and failing to follow directions—during which Ms. Woodland noted he had been warned multiple times about this,[612] and in June 2020 he was given a warning about his volume of work,[613] which had been a consistent "weakness" noted in his performance reviews.[614]

In other words, there is a genuine dispute of material fact over whether Mr. Randall's termination was related to his exercise of his FMLA rights or whether he would have been

---

[607] *Id.* at 37:11–37:15, 38:4–38, 42:6–42:8.

[608] *Id.* at 40:6–40:12.

[609] Randall Dep. 98:8–98:18 (Mr. Peek stating to Mr. Randall, "You're only getting roughly five a day, Kev. . . . Now I'm calling to say, Kevin, we've got to let you go. Hate to do it but we've got to run it like a business and we're just not getting the production we need.").

[610] Smith and Edwards Performance Evaluation Apr. 2018 at 3, ECF No. 79-8 at 4.

[611] July 17, 2018 Evaluation 1.

[612] Employee Warning Notice Nov. 7, 2019, ECF No. 79-5.

[613] Employee Warning Notice June 9, 2020, ECF No. 79-6 at 2.

[614] Smith and Edwards Performance Evaluation Apr. 2018 at 1, ECF No. 79-8 at 2; Smith and Edwards Performance Evaluation Sept. 2018, ECF No. 79-7 at 2; Smith and Edwards Performance Evaluation Sept. 2019 at 3, ECF No. 79-9.

terminated regardless. Accordingly, summary judgment on the FMLA interference claim is denied.

### B. There Is a Genuine Issue of Material Fact that Precludes Summary Judgment on Plaintiffs' FMLA Retaliation Claim.

A "retaliation claim is premised on an adverse employment action that was allegedly motivated by the employee's choice to take the protected leave."[615] It "differ[s]" from an interference claim "with respect to the timing of the adverse action."[616] "[A] retaliation claim may be brought when the employee successfully took FMLA leave, was restored to her prior employment status, and was adversely affected by an employment action based on incidents post-dating her return to work."[617]

"To establish a prima facie case of FMLA retaliation, an employee must prove that she: (1) availed herself of a protected right under the FMLA; (2) was adversely affected by an employment decision; and (3) that there was a causal connection between the two actions."[618] "Under the *McDonnell Douglas* framework, the burden then shifts to the [employer] to offer a legitimate reason for her termination, and if it does, then back to [the employee] to present evidence to suggest the stated reason was pretextual."[619]

This analysis largely mirrors that for an FMLA interference claim, except that here, the employer's intent matters. As discussed above, Defendants have produced evidence that Mr. Randall's termination was the result of a legitimate, nondiscriminatory reason: Mr. Randall could not produce the requisite number of written descriptions in those final two weeks. And, as

---

[615] *Robert*, 691 F.3d at 1219 n.6 (citing *Strickland v. Water Works & Sewer Bd. of Birmingham*, 239 F.3d 1199, 1206–07 (11th Cir. 2001); *Valdez v. McGill*, 462 F. App'x 814 (10th Cir. 2012)).
[616] *Campbell*, 478 F.3d at 1287.
[617] *Id.* at 1287–88 (citing *Doebele*, 342 F.3d at 1136–38).
[618] *Robert*, 691 F.3d at 1219 (quoting *Metzler*, 464 F.3d at 1171).
[619] *Id.*

discussed in the ADA analysis, Plaintiffs have offered evidence that raises a genuine issue of material fact as to whether Defendants' proffered reason was pretextual: the number of written descriptions requirement was implemented for the first-time during Mr. Randall's last two weeks[620]—three months after Mr. Randall received a Designation Notice[621] and just prior to his first liver offer[622]—the required number was set far above Mr. Randall's proven capacity over the prior two and a half years,[623] other Web Store Associates who did not meet a benchmark were not placed on probation,[624] and Mr. Randall's probationary period was much shorter than the 90 days described in the Employee Policy Manual.[625] As a genuine issue of material fact exists, summary judgment is precluded on this claim.

**ORDER**

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. Defendants are granted judgment on Plaintiffs' Intentional Infliction of Emotional Distress cause of action.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment is DENIED.

Signed May 31, 2023.

BY THE COURT

_____

David Barlow
United States District Judge

---

[620] Woodland Dep. 37:7–37:10, 41:17–41:20.
[621] Designation Notice (Family and Medical Leave Act) 1, ECF No. 81-1 at 457.
[622] Randall Dep. 69:3–69:8.
[623] Woodland Dep. 40:6–40:12.
[624] *Id.* at 162:20–163:15 (testifying that another Web Store Associate, Corbin Hadley, was achieving about 200 to 250 SKUs per month when his benchmark was 300, a year and a half into his employment with Smith & Edwards).
[625] Smith & Edwards Employee Policy Manual 19–20, ECF No. 81-1 at 121–22.